FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 10 2017 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
HALLMARK LICENSING, LLC and
HALLMARK MARKETING COMPANY, LLC,

        Plaintiffs,

- against -

DICKENS INC.,

        Defendant.
-----------------------------------------------------------X

Civil Action No.:

Judge:

**VERIFIED COMPLAINT**

CV 17 2149

WEXLER, J.

SHIELDS, M.J.

Plaintiffs Hallmark Licensing, LLC and Hallmark Marketing Company, LLC (collectively, "Plaintiffs" or "Hallmark") allege the following facts in support of the claims stated herein against Defendant Dickens Inc. ("Defendant" or "Dickens").

## NATURE OF THE CASE

1. This action arises out of the unlawful possession and unauthorized resale by Defendant, Dickens, of products bearing the federally registered and famous trademark, HALLMARK. Through its distribution center in Enfield, Connecticut ("Enfield"), Plaintiffs entrusted significant quantities of greeting card and related products bearing the HALLMARK trademarks to NorthStar Pulp & Paper Company ("NorthStar") for recycling. These products included greeting cards for seasonal holidays like Mother's Day, Graduations, and Easter, as well as "Everyday" cards like birthday celebrations, etc., all bearing the federally registered and famous trademark, HALLMARK (hereinafter "HALLMARK Brand Products").

2. Consistent with a written agreement between Plaintiffs' ultimate parent company, Hallmark Cards, Incorporated, and NorthStar and the prior practice between the parties, NorthStar would pick up HALLMARK Brand Products for the sole purpose of recycling those products in unsaleable condition.

3. Instead of being destroyed through recycling, and unbeknownst to Plaintiffs, the HALLMARK Brand Products ended up in the possession of Dickens, who began selling them to the market. Dickens continues to do so despite demand that it relinquish these items and turn them over to Plaintiffs. As such, Dickens remains in possession of items bearing Plaintiffs' HALLMARK mark and sells and offers them for sale to retailers, all in violation of Plaintiffs' rights in and to its valuable trademarks.

4. Dickens is believed to have as many as 8 million or more HALLMARK Brand Products in its possession, which constitutes a significant threat to the trademark rights of Plaintiffs.

5. Hallmark seeks immediate injunctive relief to stop the illegal and unauthorized sales of HALLMARK Brand Products. Plaintiffs believe that Dickens acquired these products indirectly after they were submitted to NorthStar for the purpose of destroying and recycling them. Moreover, Plaintiffs have just learned that, starting in just a few days, Dickens plans to flood the market with many of the "Everyday" Hallmark cards that it has within its possession for sale to third party retailers. The unauthorized sale of HALLMARK Brand Products by Dickens will cause Hallmark immediate irreparable harm.

6. In further damage to Plaintiffs and the Hallmark brand, Dickens offers for sale and has sold HALLMARK Brand Products at deeply reduced prices to Hallmark's own customers and authorized retailers. These unlawful actions have caused and will continue to cause Plaintiffs significant harm, including but not limited to the loss of control of the HALLMARK mark, damage to the Hallmark brand, disruption to HALLMARK'S carefully planned distribution, loss of goodwill, loss of customers, lost sales and confusion in the marketplace.

## PARTIES

7. Plaintiff Hallmark Licensing, LLC is a Kansas limited liability company with its principal place of business located in Kansas City, Missouri.

8. Plaintiff Hallmark Marketing Company, LLC is a Kansas limited liability company with its principal place of business located in Kansas City, Missouri.

9. Defendant Dickens Inc. is a New York Corporation with its principal place of business in Commack, New York.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367. Plaintiff asserts causes of action arising under the federal Lanham Act, 15 U.S.C. § 1114 and § 1125 and its state law claims are part of the same case or controversy.

12. This Court has personal jurisdiction over Dickens because Dickens is a New York corporation with its principal place of business in New York.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### I. *Hallmark Owns An Incontestable Federally Registered Trademark*

14. HALLMARK and its related companies create and distribute personal expression products such as greeting cards under its well-known and famous HALLMARK trademark. These products are sold throughout the United States in Hallmark specialty stores and in other retail

outlets. Hallmark is an industry leader for personal expression products and has developed a strong reputation as a supplier of high quality products.

15. Since at least as early as 1949, Hallmark-related entities have used the HALLMARK mark & crown design shown below on personal expression products and related retail store services:



16. To protect the Hallmark brand, the ultimate parent of Plaintiffs, Hallmark Cards, Incorporated ("Hallmark Cards"), secured federal trademark registration for numerous trademarks. Since May 30, 1950, Hallmark Cards or a subsidiary has owned an incontestable federal registration with the United States Patent and Trademark Office for its trademark "HALLMARK" for "greeting cards," Reg. No. 525,798. *See* Ex. A to the Verified Complaint.

17. In 1995, Hallmark Cards, transferred ownership of the mark to its subsidiary, plaintiff Hallmark Licensing, LLC. Hallmark Licensing, LLC licenses the use of the HALLMARK mark to plaintiff Hallmark Marketing Company, LLC.

18. Over many decades, Hallmark has spent millions of dollars in the marketing and advertising of its products and related retail store services under its HALLMARK marks. Hallmark continues to nationally advertise and market its products and associated retail store services using the HALLMARK mark through print, radio, television, digital and social advertising channels, as well as its website and authorized retailers.

19. Hallmark's products are among the top-selling personal expression products in the United States, and the ongoing success of these products is due at least, in part, to the quality of

HALLMARK Brand Products as well as Hallmark's extensive and continuous efforts to promote its products and related retail store services under the HALLMARK mark.

20. The HALLMARK mark is one of the most widely recognized brands in the nation. As a testament to Hallmark's strong brand recognition, in a 2016 US RepTrak® Report, which measures the reputation of the most highly regarded companies in the United States, Hallmark received a score of 85.1 out of 100, second only to Amazon and surpassing companies like Kellogg's, Johnson + Johnson, SONY, and the Walt Disney Company. *See* Exhibit B to the Verified Complaint, at p. 9. To maintain this pre-eminent position, Hallmark takes measures to control the quality of both the manufacture and distribution of its products. These efforts ensure that consumers who see the HALLMARK mark at retail are assured that Hallmark stands behind these products.

21. The Hallmark brand is synonymous with high quality. Indeed, when consumers encounter the HALLMARK mark in the marketplace, they are assured that the products bearing the HALLMARK mark are of the utmost quality. Indeed, the fame and goodwill associated with the Hallmark brand is one of Hallmark's most valuable assets.

22. Hallmark is vigilant in protecting its mark from trademark infringement and trademark dilution.

23. As part of its business model and to further control the quality of HALLMARK Brand Products, Hallmark has established an authorized retailer network that it refers to as the Hallmark Gold Crown Network, which currently consists of 319 company-owned stores and 1,497 independently-owned stores, which operate pursuant to licensing agreements. Gold Crown Stores are required to meet specific standards that help provide consumers with an enjoyable and consistent shopping experience. These over 1,800 stores represent Hallmark's premiere channel

of distribution. They carry a wide selection of Hallmark greeting cards and related items which they purchase directly and only from Hallmark.

24.     In addition to Gold Crown Stores, Hallmark sells its HALLMARK Brand Products to non-Gold Crown retailers of its choosing, both big-box retailers and "mom and pop shops" who offer for sale and carry a select portion of the Hallmark card lines and products. Such retailers include Walgreens, CVS, Walmart and Kroger. This extensive retailer network further establishes the strength and foothold Hallmark maintains in its industry and the minds of consumers.

25.     Hallmark employs several measures designed to control and manage its product distribution. This includes the use of product codes that are assigned to each card at production. These product codes can be used to track where and when a Hallmark product was produced.

26.     Dickens is not a customer of Hallmark and does not have Hallmark's permission or authorization to sell its HALLMARK Brand Products.

## II.     *Hallmark Agrees with NorthStar To Recycle Products*

27.     On or about May 21, 2012, Plaintiffs' ultimate parent company, Hallmark Cards, entered into an "Enterprise Agreement" with NorthStar. Attached as Exhibit 1 to the contemporaneously filed Declaration of Damon Lewis ("Lewis Declaration") is a true and correct copy of the Enterprise Agreement. Consistent with the terms of the Enterprise Agreement, NorthStar would pick up certain HALLMARK Brand Products "for recycling" and not for any other purpose or use. *See* Enterprise Agreement, at Exhibit 1 to the Lewis Declaration. The Enterprise Agreement states that "[i]f NorthStar is unable to sell the commodities for recycling, they agree to notify Hallmark for joint disposition." *Id.* The Enterprise Agreement, for the most part, covered the recycling of product coming out of Hallmark's distribution center in Enfield, CT.

28.     Since 2012, the parties' practice was for NorthStar to pick up HALLMARK Brand Products for the sole purpose of destroying through recycling products in saleable condition.

6

### III. *The Enfield Distribution Center Is Closed, Generating Millions of HALLMARK Brand Products For NorthStar To Recycle*

29. On July 7, 2015, Hallmark announced its decision to close its Enfield Distribution Center effective on or about June 30, 2016. During the closing process, Hallmark determined that millions of greeting cards and related paper products, then stored at Enfield and all bearing the HALLMARK trademark, should be disposed of through recycling.

30. As a result, and consistent with the Enterprise Agreement, Hallmark entrusted NorthStar with millions of HALLMARK Brand Products from the Enfield Distribution Center for the sole purpose of recycling them.

### IV. *Hallmark Learns That Dickens Is Selling HALLMARK Brand Products From Enfield Without Hallmark's Authorization*

31. Starting in mid-March 2017, Hallmark received numerous complaints from Hallmark retailers, stating that Dickens was offering to sell HALLMARK Brand Products to them and to non-Hallmark retailers for prices well below that typically charged by Hallmark.

32. On March 29, 2017, Ron Parodi ("Parodi"), Hallmark District Sales Manager for the Northeast, went to the Dickens warehouse located at 75 Austin Street, Commack, NY, to investigate. While there, Parodi saw HALLMARK Brand Products displayed for sale in approximately three (300) hundred square feet of sales space. Attached as Exhibit 3 to the contemporaneously filed Declaration of Ron Pardoi ("Parodi Declaration") are pictures of some of the HALLMARK Brand Products located at the Dickens warehouse. The cards mostly were for Mother's Day, Valentine's Day, and Graduation. Parodi also saw over one hundred (100) cases of Hallmark boxes on skids in the warehouse. Attached as Exhibit 4 to the Parodi Declaration are the pictures that show some of the boxes and cases Parodi observed at Dickens.

33. While at Dickens, Parodi spoke with someone who identified himself as Ken Wagner ("Wagner"), a Vice President of Dickens. Wagner gave Parodi the business card attached

as Exhibit 6 to the Parodi Declaration. Wagner told Parodi that Dickens does not regularly carry Hallmark products but that Dickens recently had a one-time opportunity to acquire truckloads of Hallmark cards being disposed of by Hallmark's Enfield Distribution Center as Enfield was being closed by Hallmark. When asked, Wagner told Parodi that Dickens had acquired approximately **73 truckloads** of Hallmark cards which had been scheduled for destruction by Enfield.

34. Wagner further told Parodi that Dickens paid an unidentified third party ten cents a card to acquire truckloads of Hallmark cards, explaining that was why Dickens was able to offer the Hallmark cards so inexpensively. Wagner also told Parodi that he had just completed a sale of Hallmark product to a Gold Crown Store located in Hainesport, New Jersey.

35. In addition to the holiday cards noted above, Wagner stated that the "Everyday" cards would be available for sale on April 15, 2017, since they had not yet had an opportunity to scan the products into the Dickens' computer system.

36. Wagner also informed Parodi that, in addition to the Hallmark cards Parodi personally observed, Dickens was then selling yet additional Hallmark cards through the company's website, www.dcgreetings.com. A visit to Dickens' website confirms Hallmark cards available for purchase. Attached as Exhibit 7 to the Parodi Declaration is a print-out of select pages from dcgreetings.com which shows HALLMARK Brand cards offered for sale.

37. In addition to the Hallmark greeting cards that Dickens was selling, Wagner told Parodi that Dickens had been offered the opportunity to purchase ten tractor trailer's worth of Hallmark marked gift bags.

38. While at Dickens, Parodi witnessed the purchase of 384 units of Hallmark cards for $266.92. The products purchased are itemized as Exhibits 8 and 9 to the Parodi Declaration, and as Exhibits 1 and 2 to the contemporaneously filed Declaration of Jeffrey C. Lloyd ("Lloyd

Declaration"). The purchaser received a two (2%) percent discount using a credit card and was offered a five percent (5%) discount if he used cash.

39. In furtherance of Hallmark's internal investigation, Jeffrey C. Lloyd ("Lloyd"), another Hallmark employee, subsequently compared the product codes for the HALLMARK Brand Products that Parodi saw purchased at Dickens with the product codes in the Hallmark computer system that records the product codes of greeting cards marked for destruction at Enfield.

40. Lloyd then created several charts which reflect the stock keeping unit numbers ("SKUs") of the items located at Dickens and compared them to the "posting date" as reflected in Hallmark's computer system. These charts are attached as Exhibits 3 and 4 to the Lloyd Declaration.

41. Lloyd's comparison confirms that most, if not all, of the HALLMARK Brand Products that Dickens had in its possession, which Parodi observed being purchased on March 29, 2017, were greeting cards with product codes that matched the product codes for cards at Enfield that had been designated for destruction.

## V. *The Cease and Desist Letter*

42. On March 30, 2017, the day after Parodi visited Dicken's facility, Hallmark, through its counsel, demanded that Dickens immediately cease and desist from selling or offering for sale any HALLMARK Brand Products, deliver such products to Plaintiffs, disclose to whom it had sold such products and account to Plaintiffs for its sales. *See* Exhibit C to the Verified Complaint. Plaintiffs requested Dickens to respond no later than the close of business, April 5, 2017.

43. Seeking to avoid responsibility for its infringing activities, and hoping to buy time in order to dump more misappropriated HALLMARK Brand Products on the market, Dickens waited to respond until 5:37 pm on April 5, 2017. Rather than directly address Plaintiffs' concerns,

Dickens' President, James Chou, sought delay. He wrote: "I have been busy this week, and will try to give you a "GOOD" answer by next Friday the latest." *See* Ex. D to the Verified Complaint at p. 3. Notably, the promised response date of "next Friday" is April 14, i.e. the day before Wagner told Parodi that Dickens' plans to offer Hallmark's "Everyday" cards to the market, once they are scanned into Dickens' computer system.

44. Counsel for Hallmark responded immediately thereafter expressing disappointment that Dickens had not taken Hallmark's concerns "more seriously." *See id.* at 2-3. Then, on April 7, after Mr. Chou sought more time and "patience", Hallmark told Mr. Chou that it would file a Complaint and seek a Temporary Restraining Order. Hallmark also suggested Mr. Chou attend with counsel, a statement reiterated on April 8. *See id.* at 1-2.

## VI. *Dickens' Wrongdoing Has Caused, And Will Continue To Cause, Immediate and Irreparable Harm to Hallmark*

45. Through Dickens' unlawful actions, the quality control measures structured and effectuated by Hallmark to maintain control over its distribution channels and brand image in the minds of consumers that it has worked tirelessly to maintain over several decades have been circumvented and disrupted by Dickens. In so doing, Dickens is debasing the Hallmark brand as well as damaging the reputation and goodwill associated with its long-standing and famous marks.

46. The goods offered for sale by Dickens under the HALLMARK mark are not genuine Hallmark products, as they were never authorized for sale in the marketplace by Hallmark.

47. Despite notice and knowledge that its acts are unlawful, Dickens continues to sell HALLMARK Brand Products without authorization and permission of Hallmark.

48. Dickens' conduct threatens to cause, and has caused, confusion in the marketplace and results in lost sales, a loss of goodwill, and disruption and interruption of Hallmark's carefully planned distribution through its authorized retailers.

## CAUSES OF ACTION

### COUNT I
### Trademark Infringement Under 15 U.SC. § 1114

49. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

50. Dickens is using Hallmark's trademark in connection with the sale of cards without Hallmark's authorization and with the specific intent to cause consumers and others in the trade to believe they are purchasing genuine Hallmark goods when in reality they are purchasing products Hallmark intended to destroy through recycling.

51. Dickens' unauthorized use of the HALLMARK mark is likely to cause confusion, or to cause mistake, or to deceive or to cause those encountering products sold by Dickens to believe that the same goods originate from or are in some manner, endorsed, sponsored, or approved by Hallmark in violation of the Lanham Act.

52. Dickens' wrongful conduct has deprived Hallmark of, among other things, the right to control the reputation and goodwill associated with its trademark. Dickens' conduct is, in all instances, willful and outrageous.

53. Unless Dickens is enjoined from engaging in its wrongful conduct, Hallmark will suffer further irreparable injury and harm, including to its goodwill and reputation, for which it has no adequate remedy of law. It will further suffer other economic losses.

### COUNT II
### Trademark Dilution Under 15 U.SC. § 1125(c)

54. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

55. The HALLMARK mark is inherently distinctive, has acquired substantial goodwill and secondary meaning, and is famous within the meaning of 15 U.S.C. § 1125 (c).

11

56. Dickens is distributing and/or selling cards bearing the HALLMARK mark.

57. Upon information and belief, Dickens acted with knowledge of the fame and reputation of HALLMARK's mark with the purpose of usurping such rights and to willfully and intentionally confuse, mislead, and deceive members of the public.

58. Dickens' actions have and are likely to continue to dilute, blur and tarnish the distinctive quality of the HALLMARK mark, and lessen the capacity of the HALLMARK mark to identify and distinguish the company's products.

59. Dickens' acts constitute willful trademark dilution pursuant to 15 U.S.C. § 1125(c), and Hallmark has been, and is likely to continue to be, damaged by these acts.

60. Unless Dickens is restrained, Hallmark will continue to suffer damages and injury to its reputation and goodwill. It will further suffer other economic losses.

## COUNT III
### Federal Unfair Competition Under 15 U.S.C. § 1125(a)

61. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

62. The HALLMARK mark has acquired substantial goodwill and secondary meaning.

63. Dickens' unauthorized use of the mark to sell the unauthorized cards constitutes a false designation of origin and a false or misleading representation of fact, which is likely to cause confusion and/or mistake and is likely to deceive customers and potential customers as to the source, origin, sponsorship, and affiliation of the cards sold by Dickens.

64. Dickens' unauthorized use of the HALLMARK mark constitutes Unfair Competition pursuant to 15 U.S.C. § 1125(a).

65. As a result of its unfair competition, Hallmark has suffered irreparable harm to its business, reputation, and goodwill. The foregoing acts of Dickens have caused, and without

judicial intervention, will continue to cause Hallmark irreparable harm for which there is no adequate remedy at law. It will also further suffer other other economic losses.

## COUNT IV
### Deceptive Trade Practices Under N.Y. Gen. Bus. Law § 349 And New York Common Law Unfair Competition

66. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

67. For the reasons set forth above, Dickens has engaged in deceptive acts or practices in the conduct of business, trade, or commerce in violation of N.Y. Gen. Bus. Law § 349 and New York common law. This conduct includes, but is not limited to, engaging in, among other things, the unauthorized sale of Hallmark's goods.

68. Dickens' use of the HALLMARK mark is likely to cause confusion, to cause mistakes, or to deceive as to the affiliation, connection or association of Dickens with Hallmark, or as to the origin, sponsorship, or approval of Dickens' goods.

69. The public is likely to be damaged as a result of Dickens' deceptive trade practices or acts.

70. Hallmark has been damaged, and will continue to be damaged, by Dickens' use of such mark.

71. Upon information and belief, Dickens' acts have been, and continue to be committed, with the purpose and intent of appropriating and passing off on Hallmark's goodwill and reputation, represented by Hallmark's well-established and famous mark.

72. As a result of its deceptive trade practices and unfair competition, Hallmark has suffered irreparable harm to its business, reputation, and goodwill. The foregoing acts of Dickens have caused, and without judicial intervention, will continue to cause Hallmark irreparable harm for which there is no adequate remedy at law. It will also further suffer other economic losses.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand an Order and judgment in Plaintiffs' favor and against Dickens:

(i) Temporarily, preliminarily and permanently enjoining Dickens from use of the HALLMARK trademark or of any mark confusingly similar to Hallmark's, including enjoining continued sales by Dickens of any Hallmark products within its possession;

(ii) Requiring Dickens to turn over its goods bearing the HALLMARK mark to Plaintiffs;

(iii) Directing Dickens to pay compensatory damages to Plaintiffs in an amount to be proven at trial;

(iv) Directing Dickens to disgorge all payments wrongfully and unjustly received;

(v) Directing Dickens to pay punitive damages in the maximum amount permitted by law;

(vi) Directing Dickens to pay statutory damages for trademark infringement and dilution in the maximum amount permitted under the federal Lanham Act;

(vii) Directing Dickens to pay costs, attorney fees, prejudgment and post judgment interest and attorney's fees for violations of the federal Lanham Act and New York law;

(viii) Directing Dickens to pay treble damages and its profits for violation of the federal Lanham Act; and

(ix) Such further relief as the Court may deem just and equitable.

Dated: New York, New York
      April 10, 2017

                                    **FOX ROTHSCHILD LLP**

*/s/ signature*
_____
George Krueger, Esq. (pending *pro hac vice* admission)
Brian Berkley, Esq. (pending *pro hac vice* admission)
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215)-299-2000

Alexandra L. Sobol, Esq.
100 Park Avenue, Suite 1500
New York, NY 10017
Telephone: (212) 878-7900
Facsimile: (212) 692-0940

*Attorneys for Plaintiffs Hallmark Licensing, LLC & Hallmark Marketing Company, LLC*

## VERIFICATION

Barry M. Katz states that he is employed in the Legal Department of Hallmark Cards, Incorporated and that his current title is Associate General Counsel. He has read the Verified Complaint and, based on the information available to the Plaintiffs, attests that the facts alleged therein are true and correct to the best of his knowledge, information and belief.

I make this statement subject to the penalties of perjury pursuant to 18 U.S.C. § 1746.

Date: April 8, 2017

_____
Barry M. Katz