**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

HALLMARK LICENSING, LLC and
HALLMARK MARKETING COMPANY, LLC     ECF Case

         Plaintiffs,          Civil Action No.: 17-cv-2149 (SJF) (AYS)

      - against -

DICKENS INC.,

         Defendant.
-----------------------------------------------------------X

### HALLMARK'S REPLY TO DICKENS' RESPONSE TO HALLMARK'S STATEMENT OF MATERIAL FACTS UNDER LOCAL RULE 56.1 AND TO DICKENS' FURTHER STATEMENTS OF MATERIAL FACTS

Hallmark[1] respectfully submits the following reply to Dickens' Response to Hallmark's 56.1 Statement of Material Facts and Dickens' 56.1 Counter-Statement of Material Facts.

### HALLMARK'S REPLY TO DICKENS' RESPONSE TO HALLMARK'S 56.1 STATEMENT OF MATERIAL FACTS

The following are Hallmark's undisputed facts to which Dickens objected or provided a qualified response without proper citation or without properly denying the facts.[2] Hallmark further notes that Dickens' failure to directly refute certain of Hallmark's asserted facts constitutes admissions of those facts.[3] All numbered paragraphs herein refer to Hallmark's 56.1 Statement of Material Facts dated June 24, 2019 and Dickens' Response dated July 15, 2019:

---

[1] Capitalized terms and short form references used herein shall have the same meaning ascribed to them in Hallmark's Opening Brief.

[2] As a preliminary matter, Dickens admitted the following numbered paragraphs from Hallmark's 56.1 Statement of Material Facts: ¶¶ 1-3, 7-8, 10-17, 21, 24-25, 31-34, 41, 43, 47, 49, 51, 53-58, and 60.

[3] *See Buckman v. Calyon Sec.,* 817 F.Supp.2d 322, 328 n. 42 (S.D.N.Y. 2011) (noting that "56.1 statements not explicitly denied by plaintiff are deemed admitted").

4.      The Hallmark products at issue and that are in the unlawful possession of Dickens are seasonal and everyday individual counter cards, all of which contain the federally registered and famous HALLMARK trademark (hereinafter referred to as "HALLMARK Branded Greeting Cards"). Declaration of Barry Katz ("Katz Decl.") at ¶3.

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The referenced cards ("the Subject Hallmark Greeting Cards") are in the lawful possession of Dickens, as Dickens purchased them from Square Peg, as a downstream purchaser from Northstar, who purchased the cards, via an authorized sale from Hallmark. (Bernstein Declaration in Support of Dickens' Motion for Summary Judgment, ("Bernstein Dec. I") ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24), ¶19, Ex. R. (Riley Dep. 40:22 – 41:11)).

**Hallmark's Response to Dickens' Denial of Hallmark' Facts:**   Dickens' response disputes only whether it is in lawful possession of the HALLMARK Branded Greeting Cards – a legal issue that is inappropriate to address in a Rule 56.1 statement.[4] Hallmark disputes that Northstar purchased the cards "via an authorized sale from Hallmark." *See* Hallmark's Opening Brief at 5-8, 16-20.

5.      The HALLMARK brand is one of the most recognized brands in the United States. Declaration of Brian Berkley ("Berkley Decl.") (Ex. A).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The conclusion stated as an undisputed fact is solely supported by the 2016 US RepTrak 100 survey, which purports to rank various companies based on the strength of their reputation, based on seven factors stated in the purported survey which lists the factors as products & services, innovation, workplace,

---

[4] *See Costello v. N.Y. State Nurses Ass'n,* 783 F.Supp.2d 656, 661 n. 5 (S.D.N.Y. 2011) (the court will disregard responses to a Rule 56.1 Statement where the responses are conclusory assertions or legal arguments).

governance, citizenship, leadership and performance. (Berkley Decl., Ex. A at 8). Notably, none of these seven factors is "brand recognition". Of further note, the survey lists the top 50 purportedly "most reputable" companies in the US, and this top 50 list does not include McDonald's, Ford, Starbucks or Coca-Cola. (Berkley Decl., Ex. A at 14).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**   Hallmark disputes Dickens' reading of Berkley Decl., Ex. A, which repeatedly discusses the strength of the Hallmark brand. Berkley Decl.[5], Ex. A at 12, 14 and 21. In addition, Dickens has stipulated to the fact that the Hallmark brand is a famous brand. *See* Stipulation at [D.E. 84].

6.      The Reputation Institute, a company that measures the reputation of the most highly regarded companies in the United States, ranked Hallmark second, which was higher than household names such as Johnson & Johnson, SONY and the Walt Disney Company. (Ex. A at 9).

**Dickens' Response to Hallmark's Asserted Fact**: Denied.  According to the Reputation Institute's most recent survey from 2019 (https://www.reputationinstitute.com/us-reptrak), Hallmark was not ranked in the top ten most reputable companies. (Declaration of Peter I. Bernstein II, July 15, 2019 ("Bernstein Dec. II") ¶7, Ex. F.)

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**   The factual statement at issue was referring to the 2016 ranking (Berkley Decl., Ex. A), which is the first full year before Dickens began selling HALLMARK Branded Greeting Cards in March 2017, and

---

[5] All deposition transcripts and exhibits are attached to and authenticated through the Berkley Declaration ("Berkley Decl."), which was submitted with Hallmark's Opening Brief, and the Berkley Reply Declaration ("Berkley Reply Decl."), which is submitted herewith as part of Hallmark's Reply Brief. Exhibits attached to the Berkley Decl. will be designated in this document by a capital letter contained within a parenthetical, and exhibits attached to the Berkley Reply Decl. will be designated by a number contained within a parenthetical.

which is the relevant baseline time period to assess Hallmark's reputation and the harm or damage to that reputation as a result of Dickens' wrongful conduct in 2017.

9.      To protect this asset, Hallmark undertakes significant measures to control the quality of both the manufacture and distribution of its products to ensure that consumers who see the HALLMARK mark at retail are assured the products are of the utmost quality and properly presented. Katz Decl. at ¶6.

**Dickens' Response to Hallmark's Asserted Fact:** Denied. There is no evidence that Hallmark engaged in significant measures to control the distribution of the Subject Hallmark Greeting Cards, as it provided no evidence to demonstrate that it ensured the destruction of such products prior to the sale of the same by Hallmark to Northstar. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24)). In fact, the Declaration of Paul Vangsness, who Hallmark asserts was the "Strategic Buyer" at Hallmark's Enfield Distribution Center states that after taking over such position from Jeff Moser in 2012, states that Mr. Vangsness would "on occasion, tour the NS (Northstar) facility for among other purposes, observing the destruction of the cards." Vangsness Decl. at ¶ 4. Notably the Vangsness declaration does not indicate how frequently he would visit the Enfield facility, does not state if he visited the Northstar facility to witness the destruction of the Subject Hallmark Greeting Cards, nor does it indicate that Hallmark sought any certificates of destruction

**Hallmark's Response to Dickens' Denial of Hallmark's Facts**: Dickens' cite to the deposition of Northstar's corporate designee, Aaron Goodman, provides no support for its denial. Hallmark further states that, throughout its lengthy relationship with Northstar, Hallmark regularly monitored the destruction and/or recycling of its greeting cards. Jeff Moser was Hallmark's Strategic Buyer at the Enfield facility from 1999 through January 2012, after which

Paul Vangsness took over those responsibilities. Moser Decl. at ¶1; Vangsness Decl. at ¶¶1, 3. As Strategic Buyers, they were responsible for overseeing the disposal of Hallmark products, including greeting cards. Moser Decl. at ¶1. Initially, Northstar was transporting the cards to an incineration facility in Springfield Massachusetts, and a Hallmark employee would follow Northstar to the facility to make sure the cards were incinerated. Moser Decl. at ¶3. Later, and after Hallmark became comfortable that Northstar was following Hallmark's instructions, Mr. Moser no longer had an employee follow Northstar to Springfield. *Id*. Towards the end of Mr. Moser's tenure as a Strategic Buyer, Northstar began recycling Hallmark cards through shredding and bailing greeting cards to be sold to a paper mill. *Id*. at ¶5. After Paul Vangsness took over Mr. Moser's role in 2012, he would periodically tour Northstar's facility to observe the destruction of greeting cards. Vangsness Decl. at ¶4. Moreover, it is undisputed that Northstar always destroyed Hallmark's greeting cards pursuant to Hallmark's instructions until the very end of the relationship. Goodman Dep. at 102:25-103:12 (Ex. F). Finally, Northstar provided documentation to Hallmark showing that the Hallmark greeting cards were being destroyed through recycling. Goodman Dep. at 62:1-69:22 (Ex. F).

18.     Hallmark did not and does not sell HALLMARK Branded Greeting Cards in the closeout or secondary market. Declaration of Tony Hofstede ("Hofstede Decl.") at ¶¶6, 8. Rather, Hallmark sells HALLMARK Branded Greeting Cards through its extensive retailer network described above. Katz Decl. at ¶8.

**Dickens' Response to Hallmark's Asserted Fact**: Denied. Hallmark sold, and transferred title to, the HALLMARK Branded Greeting cards to Northstar, in at a minimum, 2014 and 2015. (Bernstein Dec. I ¶ 18, Ex. Q (Goodman Dep. 47:1 – 48:9, 112:25 – 113:24)).

**Hallmark's Response to Dickens' Denial of Hallmark's Asserted Facts:**
Hallmark did not sell or transfer title to the HALLMARK Branded Greeting cards to Northstar at any time. Instead, the Enterprise Agreement states that Northstar was to provide "products and services generally described in Exhibit A" of the agreement to Hallmark. Vangsness Decl. at Ex. A.  Exhibit A sets forth the recycling services that Northstar was to provide, as well as the prices it would pay to Hallmark in connection with its recycling of, among other products, "card stock." *See id.* at Ex. A; Vangsness Decl. at ¶5. The payments Northstar made to Hallmark pursuant to Exhibit A represented Hallmark's share of the proceeds from Northstar's sale of the recycled greeting cards to a paper mill. Vangsness Decl. at ¶5.  The language of the Enterprise Agreement and the parties' interpretation of it confirm that the transaction between Hallmark and Northstar was an agreement for recycling services. Vangsness Decl. at ¶5; 2017 Goodman Decl. at ¶¶4, 6-7; Goodman Dep. at 150:22-25 (Ex. F).

19.     Hallmark does, by contrast, sell HALLMARK branded gift wrap, gift bags, and non-HALLMARK branded greeting cards on the secondary market exclusively through Event Sales, Inc. ("Event Sales"), subject to written restrictions intended to protect the HALLMARK brand. Hofstede Decl. at ¶¶3, 7-9.

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  Hallmark  did  not produce any documents reflecting, nor did any witness testify in a deposition to, any restrictions with respect to the sales of closeout products from Event Sales. In particular, in Dickens' Second Request for Disclosure of Documents, No. 6, Dickens sought "All communications related to the sales of Hallmark closeout products since 2011, including the communications and sales information between Event Sales and his clients." After several objections Hallmark agreed to "supplement its initial productions with non-privileged documents that are responsive to this

Request." (Bernstein Dec. II ¶ 8, Ex. G). In a letter dated February 25, 2019, Hallmark designated all of the documents that it produced that were responsive to this request and Hallmark's counsel's letter did not designate any documents speaking to alleged restrictions Event Sales placed on the sale of Hallmark products to Event Sales' customers and/or clients. (Bernstein Dec. II ¶¶ 9, 11, Ex. H). In addition, Dickens' Fifth Set of Requests for Disclosure of Documents, No. 15, sought production of

> All documents including invoices, packing lists and agreements that relate to Hallmark's transactions with the following accounts listed on HALLMARK0001065.
>
> a.   Dickens Inc.
> b.   The Kansas City Star
> c.   Top Notch Closeout
> d.   Designer Greetings
> e.   Ocean State Jobbers
> f.   99 Cents Only Stores
> g.   Marc Glassman

In response, Hallmark generally objected to the Request, but stated that "notwithstanding the...objections, Hallmark will produce non-privileged, relevant documents sufficient to show details of transaction between the listed companies, if any, since 2014, to the extent they exist and are able to be located after a reasonable search." (Bernstein Dec. II Ex. ¶ 10, Ex. I). Hallmark's counsel's February 25, 2019 letter, did not designate any documents speaking to alleged restrictions on sales between closeout accounts a.-g. above and Hallmark and/or Event Sales. (Bernstein Dec. II ¶¶ 9, 12, Ex. H).

   **Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Hofstede Decl. at ¶9 sets forth the restrictions imposed on Event Sales. In addition, Hallmark produced HALLMARK0001067-73 to Dickens during the course of discovery, which is the contract Hallmark entered into with Event Sales that sets forth the restrictions in detail. Reply Berkley Decl. at Ex. 1.

20.     It was well known, including to Dickens, that Event Sales was the exclusive closeout broker for Hallmark goods. Hofstede Decl. at ¶8, 10. Dickens had never before had an opportunity to purchase HALLMARK Branded Greeting Cards, like the ones at issue, on the closeout market, through Event Sales or anyone else. Hofstede Decl. at ¶¶6, 8.

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The asserted fact that Dickens allegedly knew that Event Sales was the exclusive closeout broker for Hallmark goods is not stated in the Hofstede Declaration. In fact, Dickens did not know that Event Sales was allegedly the exclusive closeout broker for Hallmark. (Declaration of James Chou II, July 15, 2019 ("Chou Dec. II") ¶ 4).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** In his declaration, Tony Hofstede testified that it was well known in the personal expression industry that Event Sales was the exclusive broker for Hallmark, Hofstede Decl. at ¶8, and Dickens has done business in the personal expression industry since at least the early 1980s.

22.     Dickens does not purchase HALLMARK Branded Greeting Cards or other HALLMARK branded products directly from Hallmark. Katz Decl. ¶8; Hofstede Decl. ¶6; Chou Dep. I at 37:4-20 ("I never really placed order direct to the Hallmark head office or Hallmark Kansas City") (Ex. D). Dickens' largest supplier, American Greetings, is also Hallmark's most significant competitor. February 7, 2019 Deposition of James Chou ("Chou Dep. III") at 162:14-18 (Ex. E), Chou Dep. Ex. 48 at 2 (Ex. E at 28); Katz Decl. at ¶12.

**Dickens' Response to Hallmark's Asserted Fact:** Denied. Dickens purchased HALLMARK Branded Greeting Cards and has placed orders with, and sent checks directly to, Hallmark. (Chou Dec. II ¶ 2, Ex. A).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** The documents at Chou Dec. II ¶ 2, Ex. A do not provide sufficient information to determine whether the greeting cards Dickens purchased more than ten years ago are within the definition of HALLMARK Branded Greeting Cards as set forth in paragraph 3 of Mr. Katz's June 24, 2019 Declaration, as that phrase is used in Hallmark's Opening and Reply Briefs, and other brands of greeting cards, even if owned by Hallmark, are not at issue in this litigation. *See* Supplemental Declaration of Barry Katz dated August 1, 2019 ("Katz Suppl. Decl.") at ¶2.

23.     Hallmark destroys obsolete and/or discarded HALLMARK Branded Greeting Cards to prevent them from entering the stream of commerce. Declaration of Jeff Moser ("Moser Decl.") at ¶1.

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  The only purported support for this assertion is the Declaration of Jeff Moser, a former employee of Hallmark who ceased working for Hallmark in July 2014, and ceased working as a "Strategic Buyer" on January 1, 2012. Therefore, Mr. Moser is clearly not qualified to speak to what Hallmark's "policy" and "practice" is now – or was in 2014-2017 -- with respect to how it handles allegedly "obsolete" or "discarded" cards. Declaration of Jeff Moser ("Moser Decl.") at ¶1. Further, irrespective of what the alleged Hallmark "practice" or "policy" was when Mr. Moser acted in his capacity as a "Strategic Buyer", Hallmark sold, and transferred title to, the HALLMARK Branded Greeting cards to Northstar, in at a minimum, 2014 and 2015, after Mr. Moser had ceased working as a Strategic Manager. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24.)).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Like Jeff Moser, Kim Fain, who has worked as a Senior Demand and Inventory Planner for Hallmark since 2014, testified "Hallmark destroys obsolete and/or discarded HALLMARK Branded Greeting Cards to

9

prevent them from entering the stream of commerce." *See* Supplemental Declaration of Kim Fain dated July 26, 2019 ("Fain Supplemental Decl.") at ¶4.

26.     On May 21, 2012, Hallmark and Northstar executed an Enterprise Agreement ("Enterprise Agreement") regarding the recycling of Hallmark paper products by Northstar. Vangsness Decl. at ¶2; and Ex. 1 to Vangsness Decl. Ex. 1; April 26, 2017 Declaration of Aaron Goodman ("Goodman Decl.") at ¶4.

**Dickens' Response to Hallmark's Asserted Fact:** Admitted that the Enterprise Agreement, executed on May 21, 2012, references "Recycling Purchase Products and Pricing" but denied that the transactions at issue were pursuant to the Enterprise Agreement, since the Enterprise Agreement in haec verba provided that Hallmark would purchase products and services from Northstar and here, Northstar paid Hallmark for the Subject Hallmark Greeting Cards. The Enterprise Agreement, explicitly referred to an arrangement during the Agreement's term providing for a relationship wherein the "...Company [Hallmark] shall purchase from Supplier [Northstar] and Supplier shall sell to Company the products and services generally described on Exhibit A hereto pursuant to (a) Purchase Orders submitted by Company to Supplier hereunder and (b) Specifications established by Company from time to time..." (Bernstein Dec. I ¶17, Ex. P ¶ 1).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** The Enterprise Agreement states that Northstar was to provide "products and services generally described in Exhibit A" of the agreement to Hallmark. Vangsness Decl. at Exhibit A.  Exhibit A sets forth the recycling services that Northstar was to provide, as well as the prices it would pay to Hallmark in connection with its recycling of, among other products, "card stock." *See id.*; *see also* Vangsness Decl. at ¶5. The payments Northstar made to Hallmark pursuant to Exhibit A represented

Hallmark's share of the proceeds from Northstar's sale of the recycled greeting cards to a paper mill. Vangsness Decl. at ¶5.   The language of the Enterprise Agreement and the parties' interpretation of it confirm that the transaction between Hallmark and Northstar was an agreement for recycling services. Vangsness Decl. at ¶5; 2017 Goodman Decl. at ¶¶4, 6-7; Goodman Dep. at 150:22-25 (Ex. F). Dickens' biased interpretation of someone else's agreement should carry no weight.

27.     Both parties understood that recycling required destruction, not re-sale, of the bulk card stock transferred by Hallmark to Northstar. Vangsness Decl. at ¶3; Goodman Decl. at ¶4.

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  Moreover, even Mr. Goodman testified – contrary to the assertion that "recycling" meant "destruction, **not re-sale**," that the paper products Northstar purchased in fact would, at the least, be "sold" to one or more other entities for repulp. (emphasis added). (Bernstein Dec. II, ¶2, Ex. A (Goodman Dep. 14:25-15:10)).  Notwithstanding the parties' alleged understanding, Hallmark transferred title to, relinquished control of and received consideration for the Subject Hallmark Greeting Cards.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**   Northstar's corporate designee testified that reselling the HALLMARK Branded Greeting Cards as greeting cards rather than destroying them via recycling violated their agreement. Goodman Decl. at ¶¶6, 7; Goodman Dep. at 151:4-7 (Ex. F). Mr. Goodman further testified that Northstar had never sold Hallmark products before this single incident with Square Peg, and that Northstar was supposed to destroy all cards submitted to it by Hallmark. Goodman Dep. at 102:25-103:12 (Ex. F); 70:18-71:11, (Ex. 2).

28.     Indeed, Northstar's 30(b)(6) witness, Aaron Goodman, expressly testified that recycled cards were to be destroyed:

> Q: ... When Hallmark sold greeting cards to Northstar, did it sell those cards for recycling or converting as you understood the Northstar/Hallmark relationship?
> MR. STEIN:· Objection; form.
> A: Recycling.
> Q:· And so that would include the shredding, bailing and selling to a paper mill for repulping; is that correct?
> A:· Yes, sir.

Goodman Dep. at 20:13-25 (Ex. F).

**Dickens' Response to Hallmark's Asserted Fact:** Denied that Northstar's 30(b)(6) witness expressly testified that the recycled cards were to be destroyed. Rather, Mr. Goodman's affirmative response to the question "And so that would include the shredding, bailing and selling to a paper mill for repulping; is that correct?" (emphasis added) merely demonstrated that **some** of the reasons for the sale of the Subject Hallmark Greeting Cards to Northstar **included** those listed in the referenced question. By responding "Yes, sir" to this question, Mr. Goodman was stating that the reasons listed therein were not exclusive. Therefore, it is apparent that Mr. Goodman did not expressly testify the Subject Hallmark Greeting Cards were to be "destroyed". Notwithstanding Mr. Goodman's testimony, Hallmark transferred title to, relinquished control of and received consideration for the Subject Hallmark Greeting Cards.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Northstar's corporate designee testified that reselling the HALLMARK Branded Greeting Cards as greeting cards instead of destroying them through recycling was a violation of their agreement and further stated that Hallmark provided its products to Northstar "for destruction through recycling." Goodman Decl. at ¶¶6, 7; Goodman Dep. at 151:4-7 (Ex. F). Mr. Goodman further testified that Northstar had never sold Hallmark products before this single incident with Square Peg, and that Northstar was supposed to destroy all cards submitted to it by Hallmark. Goodman Dep. at 102:25-

103:12 (Ex. F); 70:18-71:11 (Ex. 2). Dickens attempts to interpret the testimony of Goodman in a way that is contrary to its clear meaning.

29.   Once the bailed paper stock was delivered to the paper mill, it would undergo a "deinking process" that removes all ink from the paper fibers and completes the destruction of the cards. Goodman Dep. at 22:4-23:6 (Ex. F).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. On May 21, 2012, Hallmark and Northstar executed an "Enterprise Agreement," which explicitly referred to an arrangement during the Agreement's term providing for a relationship wherein the "...Company [Hallmark] shall purchase from Supplier [Northstar] and Supplier shall sell to Company the products and services generally described on Exhibit A hereto pursuant to (a) Purchase Orders submitted by Company to Supplier hereunder and (b) Specifications established by Company from time to time..." (Bernstein Dec. I ¶17, Ex. P). An arrangement whereby Northstar was to pay Hallmark was therefore never contemplated by the Enterprise Agreement, and therefore, the Enterprise Agreement was not applicable to the facts at bar. Further, to the extent that Enterprise Agreement is applicable, Exhibit "A" does not state, in any capacity, that the Hallmark Branded Greeting in question must undergo a deinking process or be destroyed. In addition, the assertion that the baled paper stock delivered to a paper mill "would undergo a 'de-inking process'" mischaracterizes Mr. Goodman's testimony wherein he merely answers in the affirmative when asked if the "deinking process" was "contemplated."

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** As noted above, Mr. Goodman testified that after the bailed paper stock was delivered to the paper mill, it would undergo a "deinking process" that removes all ink from the paper fibers and completes the destruction of the cards. Goodman Dep. at 22:4-23:6 (Ex. F). He also testified that reselling the

HALLMARK Branded Greeting Cards as greeting cards instead of destroying them through recycling was a violation of their agreement and further stated that Hallmark provided its products to Northstar "for destruction through recycling." 2017 Goodman Decl. at ¶¶6, 7; Goodman Dep. at 151:4-7 (Ex. F). He further testified that Northstar had never sold Hallmark products before this single incident with Square Peg, and that Northstar was supposed to destroy all cards submitted to it by Hallmark. Goodman Dep. at 102:25-103:12 (Ex. F); 70:18-71:11 (Ex. 2).

30.     Pursuant to the Enterprise Agreement, Northstar would typically pay Hallmark approximately $10 per ton to acquire and recycle HALLMARK Branded Greeting Cards as bulk card stock and after recycling the card stock Northstar would, in turn, sell the shredded card stock to a paper mill for repulping. *Id.* at 20:13-25; 94:9-13; 113:19-24 (Ex. F).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. On May 21, 2012, Hallmark and Northstar executed an "Enterprise Agreement," which explicitly referred to an arrangement during the Agreement's term providing for a relationship wherein the "...Company [Hallmark] shall purchase from Supplier [Northstar] and Supplier shall sell to Company the products and services generally described on Exhibit A hereto pursuant to (a) Purchase Orders submitted by Company to Supplier hereunder and (b) Specifications established by Company from time to time..." (Bernstein Dec. I ¶17, Ex. P). An arrangement whereby Northstar was to pay Hallmark was therefore never contemplated by the Enterprise Agreement, and therefore, the Enterprise Agreement was not applicable to the transfer of the Subject Hallmark Greeting Cards from Hallmark to Northstar. Further, to the extent that Enterprise Agreement is applicable, Exhibit "A" does not speak to a payment for "card stock" in the amount of $10/ST, which is what Northstar paid Hallmark for the sale of the Subject Hallmark Greeting Cards. (Bernstein Dec. 1, ¶¶ 3 – 16, Exs. B – O). Exhibit "A" lists a price of $55 OBM for "Baled Card Stock" and a price of $10 OBM

for "Sorted White Ledge". "OBM" is an acronym for "Official Board Market". (Bernstein Dec. I ¶17, Ex. P).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  The Enterprise Agreement states that Northstar was to provide "products and services generally described in Exhibit A" of the agreement to Hallmark. Vangsness Decl. at Exhibit A.  Exhibit A sets forth the recycling services that Northstar was to provide, as well as the prices it would pay to Hallmark in connection with the recycling of, among other products, "card stock." *See id.* at Exhibit A; Vangsness Decl. at ¶5. The payments Northstar made to Hallmark pursuant to Exhibit A represented Hallmark's share of the proceeds from Northstar's sale of the recycled greeting cards to a paper mill. Vangsness Decl. at ¶5.  The language of the Enterprise Agreement and the parties' interpretation of it confirm that the transaction between Hallmark and Northstar was an agreement for recycling services. Vangsness Decl. at ¶5; 2017 Goodman Decl. at ¶¶4, 6-7; Goodman Dep. at 150:22-25. (Ex. F). Northstar's corporate designee testified that reselling the Hallmark branded greeting cards as greeting cards instead of recycling them was a breach of their agreement. Goodman Decl. at ¶7; Goodman Dep. at 151:4-7 (Ex. F).

35.    All remaining Enfield inventory, amounting to millions of greeting cards and related paper products, including HALLMARK Branded Greeting Cards, was entrusted to Northstar for destruction pursuant to the Enterprise Agreement. Lloyd Decl. at ¶2.

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  Hallmark  did  not "entrust" the cards to Northstar but rather sold, and transferred title to, the HALLMARK Branded Greeting Cards to Northstar, in at a minimum, 2014 and 2015. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 47:1 – 48:9, 112:25 – 113:24)). On May 21, 2012, Hallmark and Northstar executed an "Enterprise Agreement," which explicitly referred to an arrangement during the

Agreement's term providing for a relationship wherein the "...Company [Hallmark] shall purchase from Supplier [Northstar] and Supplier shall sell to Company the products and services generally described on Exhibit A hereto pursuant to (a) Purchase Orders submitted by Company to Supplier hereunder and (b) Specifications established by Company from time to time..." (Bernstein Dec. I ¶17, Ex. P). An arrangement whereby Northstar was to pay Hallmark was therefore never contemplated by the Enterprise Agreement, and therefore, the Enterprise Agreement was not applicable to the facts at bar. Further, to the extent that Enterprise Agreement is applicable, Exhibit "A" does not state, in any capacity, that the Hallmark Branded Greeting in question must be destroyed.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Dickens' assertion that the HALLMARK Branded Greeting Cards were sold instead of entrusted to Northstar is a legal issue that is inappropriate to raise in response to Hallmark's Rule 56.1 Statement of Material Facts. *See Costello,* 783 F.Supp.2d at 661 n. 5. Mr. Goodman admitted that Northstar never paid Hallmark the $10/ton remittance for a significant portion (probably the majority) of the greeting cards sold to Square Peg. *See* Declaration of Aaron Goodman dated July 12, 2019 ("2019 Goodman Decl.") at ¶7. In addition, the Enterprise Agreement states that Northstar was to provide "products and services generally described in Exhibit A" of the agreement to Hallmark. Vangsness Decl. at Ex. A. Exhibit A sets forth the recycling services that Northstar was to provide, as well as the prices it would pay to Hallmark in connection with its recycling of, among other products, "card stock." *See id.*; *see also* Vangsness Decl. at ¶5. The payments Northstar made to Hallmark pursuant to Exhibit A represented Hallmark's share of the proceeds from Northstar's sale of the recycled greeting cards to a paper mill. Vangsness Decl. at ¶5. The language of the Enterprise Agreement and the parties' interpretation of it confirm that the

transaction between Hallmark and Northstar was an agreement for recycling services. Vangsness Decl. at ¶5; 2017 Goodman Decl. at ¶¶4, 6-7; Goodman Dep. at 150:22-25 (Ex. F). Northstar's corporate designee testified that reselling the Hallmark branded greeting cards as greeting cards instead of destroying them through recycling was a violation of their agreement. Goodman Decl. at ¶7; Goodman Dep. at 151:4-7 (Ex. F).

36.     Northstar was informed of the closing of Enfield and the increased volume of recycling in the summer of 2015. Goodman Decl. at ¶5; Goodman Dep. at 44:25-45:17; 51:12-21 (Ex. F). Following the announced closing of Enfield, Northstar received approximately 73 trailer loads of Enfield inventory to be recycled. Goodman Decl. at ¶6; Goodman Dep. at 51:23-52:14 (Ex. F).

**Dickens' Response to Hallmark's Asserted Fact:** Admitted that Northstar was informed of the closing of Enfield and the increased volume of recycling in the summer of 2015. Denied that following the announced closing of Enfield, Northstar received approximately 73 trailer loads of Enfield inventory to be recycled. Northstar purchased, received and took title to approximately 73 trailer loads of Enfield inventory. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 47:1 – 48:9, 112:25 – 113:24). Notwithstanding Mr. Goodman's testimony regarding the acquisition of the Enfield inventory, Hallmark transferred title to, relinquished title to and received consideration for, the Subject Hallmark Greeting Cards. Further, on May 21, 2012, Hallmark and Northstar executed an "Enterprise Agreement," which applied to transactions wherein "...Company [Hallmark] shall purchase from Supplier [Northstar] and Supplier shall sell to Company the products and services generally described on Exhibit A hereto pursuant to (a) Purchase Orders submitted by Company to Supplier hereunder and (b) Specifications established by Company from time to time..." (Bernstein Dec. ¶17, Ex. P). An arrangement whereby Northstar

was to pay Hallmark was therefore never contemplated by the Enterprise Agreement, and therefore, the Enterprise Agreement was not applicable to Northstar's purchase and acquisition of Hallmark greeting cards upon the closing of the Enfield facility. Further, to the extent that the Enterprise Agreement is applicable, Exhibit "A" does not state, in any capacity, that the Subject Hallmark Greeting Cards must be recycled or destroyed.

      **Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Dickens' response is a legal issue that is inappropriate to raise in response to Hallmark's Rule 56.1 Statement of Material Facts. *See Costello,* 783 F.Supp.2d at 661 n. 5. Northstar's corporate designee testified that reselling the HALLMARK Branded Greeting Cards as greeting cards instead of destroying them through recycling was a violation of its agreement with Hallmark. Goodman Decl. at ¶7; Goodman Dep. at 151:4-7 (Ex. F). The Enterprise Agreement states that Northstar was to provide "products and services generally described in Exhibit A" of the agreement to Hallmark. Vangsness Decl. at Ex. A. Exhibit A sets forth the recycling services that Northstar was to provide, as well as the prices it would pay to Hallmark in connection with its recycling of, among other products, "card stock." *See id.*; *see also* Vangsness Decl. at ¶5. The payments Northstar made to Hallmark pursuant to Exhibit A represented Hallmark's share of the proceeds from Northstar's sale of the recycled greeting cards to a paper mill. Vangsness Decl. at ¶5. The language of the Enterprise Agreement and the parties' interpretation of it confirm that the transaction between Hallmark and Northstar was an agreement for recycling services. Vangsness Decl. at ¶5; 2017 Goodman Decl. at ¶¶4, 6-7; Goodman Dep. at 150:22-25 (Ex. F).

      37.    Instead of destroying the HALLMARK Branded Greeting Cards in accordance with the Enterprise Agreement and the parties' long-standing practice, Northstar knowingly and secretly misappropriated HALLMARK Branded Greeting Cards by selling, instead of recycling,

73 trailer loads of Hallmark products to the principal representatives of a newly formed company, Square Peg, for purposes of buying the cards. Goodman Decl. at ¶7; Goodman Dep. at 150:19-151:7 (Ex. F).

      **Dickens' Response to Hallmark's Asserted Fact:** Denied.   First,   Northstar's purchase of Hallmark Greeting Cards pursuant to the closing of the Enfield facility was not pursuant to the Enterprise Agreement, which applied only to transactions wherein **Hallmark paid Northstar** for Northstar's "products and services" not vice-versa. (Bernstein Dec. ¶17, Ex. P). Second, the evidence provided by Hallmark in the Goodman Decl. at ¶7 and Goodman Dep. at 150:19- 151:7 (Ex. F) does not establish any "long-standing practice" with respect to the conduct between the parties. Third, notwithstanding Mr. Goodman's testimony regarding the acquisition of the Enfield inventory, Hallmark transferred title to, relinquished control of, and received consideration for, the Subject Hallmark Greeting Cards in at a minimum, 2014 and 2015. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 47:1 – 48:9, 112:25 – 113:24)). Pursuant to this authorized sale and transfer of title, Northstar's subsequent re-sale to Square Peg was not a misappropriation of the Subject Hallmark Greeting Cards. Moreover, Square Peg was formed for the purpose of buying and reselling a variety of closeout products that included greeting cards and kitchen knives, for example. (Bernstein Dec. II ¶5, Ex. D (Wagner 53:22 – 54:17)

      **Hallmark's Response to Dickens' Denial of Hallmark's Facts:** First, Dickens' assertion that the HALLMARK Branded Greeting Cards were sold instead of entrusted to Northstar and that Northstar received legal title are legal issues that are inappropriate to raise in response to Hallmark's Rule 56.1 Statement of Material Facts. *See Costello,* 783 F.Supp.2d at 661 n. 5.  Second, Mr. Goodman admitted that Northstar never paid Hallmark the ten dollars ($10)/ton remittance for a significant portion (probably the majority) of the greeting cards sold to Square

Peg. 2019 Goodman Decl. at ¶7. Third, as both parties to the Enterprise Agreement testified, Hallmark and Northstar had a "long-standing relationship" beginning in "the early 2000s" wherein Northstar would destroy, through recycling, HALLMARK Branded Greeting Cards. Goodman Dep. at 55:23-24 (Ex. 2); Moser Decl. at ¶3; Goodman Decl. at ¶4. Mr. Goodman further testified that Northstar had never sold Hallmark products before this single incident with Square Peg, and that Northstar was supposed to destroy all cards Hallmark submitted to it. Goodman Dep. at 102:25-103:12 (Ex. F); 70:18-71:11 (Ex. 2). Northstar's corporate representative also testified that reselling the HALLMARK  Branded Greeting Cards as greeting cards instead of recycling them was a violation of the parties' agreement. Goodman Decl. at ¶7; Goodman Dep. at 151:4-7 (Ex. F).  Third, Hallmark disputes that Northstar purchased the cards "via an authorized sale from Hallmark." *See* Hallmark's Opening Brief at 5-8, 16-20. Fourth, Mr. Riley testified that he formed Square Peg after learning of the opportunity to acquire the HALLMARK Branded Products from Northstar through Roger Slate. Riley Dep. at 81:18-22 (Ex. 3)

38.     Northstar had never sold HALLMARK Branded Greeting Cards prior to its unlawful transaction with Square Peg. Goodman Dep. at 102:25-103:12 (Ex. F).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. Northstar's sale of the referenced cards ("the Subject Hallmark Greeting Cards") was not unlawful and those cards are in the lawful possession of Dickens, as Dickens lawfully purchased them from Square Peg, as a downstream purchaser from Northstar, who purchased the cards, via an authorized, lawful sale from Hallmark. (Bernstein Declaration I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24), ¶19, Ex. R. (Riley Dep. 40:22 – 41:11)).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Dickens' response, which disputes whether it was in the lawful possession of the HALLMARK Branded

Greeting Cards, is a legal issue that is inappropriate to address in a Rule 56.1 statement. *See Costello,* 783 F.Supp.2d at 661 n. 5.  Hallmark further disputes that Northstar purchased the cards "via an authorized, lawful sale from Hallmark." *See* Hallmark's Opening Brief at 5-8, 16-20.

39.     When it purchased the 73 trailer loads, Square Peg delivered paper bags filled with $194,000 in cash to the key principals of Northstar. This sum is well below the actual value of the cards. Goodman Dep. at 94:1-13, 98:7-16, 106:1-6 (Ex. F); Goodman Decl. at ¶12.

**Dickens' Response to Hallmark's Asserted Facts:** Denied. This alleged undisputed fact is inconsistent and/or mischaracterizes the evidence cited to support the same. First, the Goodman testimony referenced by Hallmark indicates that Northstar received $195,000 from Square Peg, not $194,000. Second, nothing in either the Goodman deposition or the Riley deposition indicate that the payments were made in cash in paper bags. Third, Mr. Goodman declared that "[N]orthstar is not in the business of selling greeting cards", and therefore has no expertise with respect to the "actual value" of greeting cards. In any event, the "actual value of the cards" to a closeout company such as Square Peg is the amount that a company such as Square Peg was willing to pay for them in an arm's length transaction. (Bernstein Dec. II ¶ 2, Ex. A. Goodman Dep. 12:19 - 16:2); Plaintiff's Exhibit-Declaration of Aaron Goodman Dec. ¶ 9).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** First, whether the transaction price was $194,000 or $195,000 is immaterial. Goodman Dep. at 98:7-16 (noting $195,000 paid to Northstar for HALLMARK Branded Greeting Cards) (Ex. F); Riley Dep. at 95:4-5 (noting $194,000 paid to Northstar for HALLMARK Branded Greeting Cards) (Ex. 7). Second, Riley testified that it was a cash transaction. *Id*. at 95:1-5 (Ex. 7).  Third, the actual value of the HALLMARK Branded Greeting Cards that Northstar sold to Square Peg far exceeds the amount paid by Square Peg as part of the illicit transaction. Katz Suppl. Decl. at ¶4.

40. Northstar then took significant measures to avoid detection by Hallmark: First, the cash transaction was not reflected on Northstar's books. Goodman Decl. ¶11.

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The declaration statement asserted by Aaron Goodman does not speak to "significant measures" to avoid the transaction. Further, nothing in the Goodman Declaration indicates that payment was made for the cards in cash.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** The Goodman Declaration specifically states that the sale of the Hallmark cards from Northstar to Square Peg was "*purposefully* not reflected by any written documentation of any party *whatsoever*." 2017 Goodman Decl. at ¶11 (emphasis added). It further states, "Northstar instructed the Individuals not to sell any cards until *after* the Enfield Distribution Center was closed," which Goodman testified was to avoid detection by Hallmark. *Id.* at ¶8 (emphasis added); Goodman Dep. at 57:4-14 ("Because we were not permitted to sell the – the cards – for reuse. And if – if they had started selling before the facility was closed, we would not have had the opportunity to purchase this material from Hallmark.") (Ex. F). Steven Riley, the other party to the Northstar-Square Peg transaction, testified that it was a cash transaction. Riley Dep. at 95:1-5 (Ex. 7). Finally, Hallmark further notes that every time Mr. Goodman was asked at Northstar's 30(b)(6) deposition whether it was a cash transaction, Mr. Goodman invoked his Fifth Amendment right against self-incrimination. *See, e.g.,* Goodman Dep. at 98:17-23 (Ex. F).

42. Third, Northstar purposefully avoided any written documentation of the transaction, Goodman Decl. at ¶11, and Square Peg did not include the $194,000 payment on its tax return. Deposition of Steven Riley ("Riley Dep.") at 47:21-24 (Ex. G).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The reference to the Steven Riley deposition from April 26, 2018 does not refer to Square Peg's tax return, nor did Hallmark attach page 47 of Riley's deposition of this date.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Hallmark mistakenly referenced the wrong page of Mr. Riley's deposition. *See* Riley Dep. at 211:21-212:7 (noting that Square Peg did not include the Northstar payment on its tax return) (Ex. 7). Hallmark further notes that Dickens admits Northstar purposefully avoided any written documentation of the transaction, as Dickens did not rebut this fact.

44. Following receipt of a sample of the cards, Wagner called Riley to ask about price and was told that it was 10¢ a card, far below the normal wholesale price for such cards. Wagner Dep. at 45:11-46:18 (Ex. H).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The assertion grossly mischaracterizes the portion of the Wagner testimony to which it cites, in which while Wagner discussed the retail value of the cards, he did not testify as to the "normal wholesale price of such cards" at all.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Hallmark corrects its prior asserted fact to read: "Following receipt of a sample of the cards, Wagner called Riley to ask about price and was told that it was 10¢ a card, far below the normal ***retail*** price for such cards." Wagner Dep. at 45:11-46:18 (Ex. H) (emphasis added).

45. Dickens claims that it negotiated a deal with Square Peg to purchase all 73 trailer loads of the HALLMARK Branded Greeting Cards but for space reasons, needed to take them over a two-year period. Wagner Dep. at 60:18-61:4 (Ex. H). Prior to Hallmark commencing this

litigation, Dickens had received three semi-truck trailer loads filled with about 1.5 million cards. Chou Dep. I at 128:15-129:23; 192:8-13 and Dep. Ex. 5 (Ex. D).

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  Dickens negotiated a deal with Square Peg to purchase approximately 20 trailer loads of the Subject Hallmark Greeting Cards. (Berkley Dec. (Ex. H) (Wagner Dep. at 60:18-61:4)).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Mr. Wagner testified at his deposition that Dickens had a contract to buy *all* of Square Peg's merchandise. Wagner Dep. at 263:17-264:16 (Ex. 4).   There were approximately 73 trailer loads of HALLMARK Branded Greeting Cards in Square Peg's possession.  Goodman Dep. at 114:24-115:4 (Ex. 2); Riley Dep. at 209:12-15 (Ex. 3).  Hallmark further notes that Dickens admits that it had received three trailer loads filled with about 1.5 million cards, as it did not rebut this fact.

46.    Dickens made no effort to understand how Square Peg was able to acquire the cards beyond Mr. Riley's self-serving statement that the cards were not "stolen." Chou Dep. I at 87:4-20 (Ex. D).

**Dickens' Response to Hallmark's Asserted Fact**: Denied.   Prior to purchasing the Subject Hallmark Greeting Cards from Square Peg, Mr. Chou and Mr. Wagner met with Mr. Riley at Dickens' facility. During the meeting, Dickens specifically inquired as to how Square Peg acquired the cards. Mr. Riley explained that the cards came from Hallmark's Enfield facility, which had closed down and that Enfield had "extra merchandise that they couldn't absorb in Kansas City. So they had to dispose of them or get rid of them or close them out" Bernstein Dec. II ¶5, Ex. D (Wagner: 58:19-22)).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  While it is true that Mr. Riley testified that the cards came from Hallmark's Enfield facility, Mr. Riley did not

offer any information as to how he acquired the products or from whom he acquired the products, nor did Dickens make any effort to find out this information. Wagner Dep. at 59:8-24 (Ex. 4).

48.     Dickens did, however, contact Event Sales and asked whether Hallmark had released a lot of closeout counter cards. Event Sales told Dickens that it had no knowledge of that occurring. Hofstede Decl. at ¶10 and Ex. A to Hofstede Decl. Nonetheless, Dickens purchased the cards from Northstar.

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  Dickens  purchased the cards from Square Peg, which purchased the cards from Northstar. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24), ¶19, Ex. R. (Riley Dep. 40:22 – 41:11)).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**   Hallmark corrects its prior asserted fact and agrees with Dickens' characterization that Dickens purchased the cards from Square Peg, which purchased the cards from Northstar.  Hallmark further notes that Dickens admits (since it did not rebut) that Dickens did contact Event Sales to ask whether Hallmark had released a lot of closeout counter cards, to which Event Sales responded that it had no knowledge of that occurring. Hofstede Decl. at ¶10 and Ex. A to Hofstede Decl.

50.     Shortly after Dickens began marketing the HALLMARK Branded Greeting Cards, Hallmark received complaints from some of its Gold Crown retailers regarding the products offered by Dickens at steep discounts compared to the wholesale prices they were paying Hallmark. Deposition of John Chase ("Chase Dep.") at 58:17-59:7; 60:19-24 (Ex. I).

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  While the testimony from John Chase speaks to complaints received from Gold Crown retailers in general, there is nothing in the Chase testimony that speaks to the wholesale prices Gold Crown retailers were

paying Hallmark for the cards they were purchasing relative to the price Dickens was charging for the same cards.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  It can be inferred from Mr. Chase's testimony that Gold Crown retailers were complaining about Dickens' sale of the HALLMARK Branded Greeting Cards because Dickens was offering them for much less than the wholesale prices that the retailers were paying Hallmark. Hallmark further notes that Dickens admits that Hallmark received complaints from its Gold Crown retailers shortly after Dickens began marketing the HALLMARK Branded Greeting Cards, as it did not rebut this fact.

52.     Indeed, Dickens' CEO and 30(b)(6) witness, James Chou, acknowledged that Dickens' sale of the HALLMARK Branded Greeting Cards would harm the HALLMARK brand and that it was his intent and purpose to harm Hallmark given his long-held animus towards the company. Chou Dep. III at 468:21-24  ("Q. But you recognize, right, selling at a huge discount could seriously damage the Hallmark brand; right? A. Yes.") (Ex. E).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The assertion made by Hallmark mischaracterizes Mr. Chou's testimony. While Mr. Chou's referenced answer indicated that his sales of the Subject Hallmark Greeting Cards could damage the Hallmark brand, he did not testify that it was his intent to harm Hallmark, nor does the referenced testimony demonstrate an alleged "long-held animus" towards Hallmark.

**Hallmark's Response to Dickens' Denial of Hallmark's Asserted Facts:** Mr. Chou has made his long-held animus towards Hallmark clear throughout Dickens' 30(b)(6) depositions. *See, e.g.,* Chou Dep. I at 59:7-15 (Ex. D) (admitting that he viewed Hallmark as "an evil giant" and that he "really dislike[s] Hallmark"); *Id.* at 310:25-311:7 (Ex. D) (noting that this litigation has presented him with "a lifetime opportunity" to get "justice" and the ability to "fight

against the evil giant");  Chou Dep. III at 324:6-9; 327:20-328:3; 468:21-24 (Ex. E) (recognizing that selling HALLMARK Branded Greeting Cards at a huge discount could harm the Hallmark brand). He also made his intent to harm the Hallmark brand clear to Hallmark's primary competitor, American Greetings, when he wrote, "With such a huge volume of Hallmark cards dumping into the market, I believe the market will be in a turmoil, and *the Hallmark brand will be seriously damaged. If I can secure more Hallmark cards at 10 cents apiece, I can sell the cards to Hallmark stores at huge discount, and open many new opportunities for me to sell more AG/Gibson cards to Hallmark stores at regular prices in the future.*" Berkley Decl. at Ex. P (emphasis added). Hallmark further notes that Dickens admits that selling the HALLMARK Branded Greeting Cards at a huge discount could seriously damage the Hallmark Brand, as it did not rebut this fact.

59.    James Chou admitted Dickens intended to harm the HALLMARK brand when purchasing the HALLMARK Branded Greeting Cards. Chou Dep. III at 468:21-24 (Ex. E) ("Q. But you recognize, right, selling at a huge discount could seriously damage the Hallmark brand; right? A. Yes.").

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The assertion made by Hallmark mischaracterizes Mr. Chou's testimony. While Mr. Chou's referenced answer indicated that his sales of the Subject Hallmark Greeting Cards could damage the Hallmark brand, he did not testify that it was Dickens' intent to harm Hallmark.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Mr. Chou made his long-held animus towards Hallmark clear throughout Dickens' 30(b)(6) deposition.  *See, e.g.,* Chou Dep. I at 59:7-15 (Ex. D) (admitting that he viewed Hallmark as "an evil giant" and that he "really dislike[s] Hallmark"); *Id.* at 310:25-311:7 (Ex. D) (noting that this litigation has presented

him with "a lifetime opportunity" to get "justice" and the ability to "fight against the evil giant"); Chou Dep. III at 324:6-9; 327:20-328:3; 468:21-24 (Ex. E) (recognizing that selling HALLMARK Branded Greeting Cards at a huge discount could harm the Hallmark brand) (Ex. E). He also made his intent to harm the Hallmark brand clear to Hallmark's primary competitor, American Greetings, when he wrote, "With such a huge volume of Hallmark cards dumping into the market, I believe the market will be in a turmoil, and *the Hallmark brand will be seriously damaged. If I can secure more Hallmark cards at 10 cents apiece, I can sell the cards to Hallmark stores at huge discount, and open many new opportunities for me to sell more AG/Gibson cards to Hallmark stores at regular prices in the future.*" Berkley Decl. at Ex. P (emphasis added). Hallmark further notes that Dickens admits that selling the HALLMARK Branded Greeting Cards at a huge discount could seriously damage the Hallmark Brand, as it did not rebut this fact.

61.     As this email shows, Dickens purposely sought to improperly use Hallmark's mark to intentionally hurt Hallmark. In addition, Dickens personnel have consistently testified that selling HALLMARK Branded Greeting Cards to discount stores would likely harm Hallmark's brand. Deposition of Paul Voisin ("Voisin Dep.") at 279:5-9, 280:23-281:2, 285:19-22 (Ex. Q); Chou Dep. III at 324:6-9, 327:20-328:3, 468:21-24 (Ex. E) ("Q. But you recognize, right, selling at a huge discount could seriously damage the Hallmark brand; right? A. Yes.").

**Dickens' Response to Hallmark's Asserted Fact:** Denied. Dickens could not have improperly used Hallmark's mark, as it purchased, and sold, genuine Hallmark Branded cards, as a downstream purchaser subsequent to an authorized first sale from Hallmark to Northstar. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24), ¶19, Ex. R. (Riley Dep. 40:22 – 41:11)). Further, the assertion that Dickens personnel have consistently testified that selling HALLMARK Branded Greeting Cards "**would likely**" harm Hallmark's brand,

mischaracterizes the portions of the testimony referenced in support of this statement, in that each statement indicates that Dickens' sales, despite being lawful in nature "**could**" harm the Hallmark brand.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**   Dickens' response, which disputes whether it was in the lawful possession of the HALLMARK Branded Greeting Cards, is a legal issue that is inappropriate to address in a Rule 56.1 statement. *See Costello,* 783 F.Supp.2d at 661 n. 5.  Hallmark further disputes that Northstar purchased the cards "via an authorized first sale from Hallmark to Northstar." *See* Hallmark's Opening Brief at 5-8, 16-20.   Further, as set forth previously, Mr. Voisin testified at his deposition that selling HALLMARK Branded Greeting Cards to discount stores "**would,**" NOT "could," harm the Hallmark brand. *See* Voisin Dep. at 279:5-9 (Q: And for the same reason that it would hurt the Gibson brand selling these Hallmark cards to this discount store, it *would* hurt the Hallmark brand? A: Yes.) (emphasis added) (Ex. Q).

62.     Dickens' actions were borne of a longstanding animus toward Hallmark. Chou Dep. I at 59:7-17; 310:25-311:2-10 (Ex. D); Chou Dep. III at 401:7-8 (Ex. E).

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  The asserted fact mischaracterizes Mr. Chou's testimony as it fails to establish that Dickens/Square Peg transaction was borne of Mr. Chou's personal feelings about Hallmark rather than, e.g., a profit motive. Dickens has repeatedly conceded Hallmark is a competitor of Dickens. (Berkley Dec. ¶ 16, Ex. O (Chou Dep. II: 534:20-22); . ¶6, Ex. E (Chou Dep. III: 275:7-12)).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Mr. Chou made his long-held animus towards Hallmark clear throughout Dickens' 30(b)(6) deposition. *See, e.g.,* Chou Dep. I at 59:7-15 (Ex. D) (admitting that he viewed Hallmark as "an evil giant" and that he

"really dislike[s] Hallmark"); *Id.* at 310:25-311:7 (Ex. D) (noting that this litigation has presented

him with "a lifetime opportunity" to get "justice" and the ability to "fight against the evil giant")

(Ex. D);  Chou Dep. III at 324:6-9; 327:20-328:3; 468:21-24 (Ex. E) (recognizing that selling

HALLMARK Branded Greeting Cards at a huge discount could harm the Hallmark brand). He

also made his intent to harm the Hallmark brand clear to Hallmark's primary competitor, American

Greetings, when he wrote, "With such a huge volume of Hallmark cards dumping into the market,

I believe the market will be in a turmoil, and ***the Hallmark brand will be seriously damaged. If I***

***can secure more Hallmark cards at 10 cents apiece, I can sell the cards to Hallmark stores at***

***huge discount, and open many new opportunities for me to sell more AG/Gibson cards to***

***Hallmark stores at regular prices in the future.***" Berkley Decl. at Ex. P (emphasis added).

63.      Northstar did not pay a price per card, as is typical when a party purchases

HALLMARK Branded Greeting Cards "in commerce." Chou Dep. III at 131:4-10 (Ex. E).

**Dickens' Response to Hallmark's Asserted Fact:** Denied.   Hallmark's reliance

upon the testimony of James Chou is misplaced in that Mr. Chou cannot testify as to what Northstar

paid in order to purchase the Subject Hallmark Greeting Cards, since he lacks personal knowledge

of such payments. See Fed. R. Evid, 602. This assertion further grossly mischaracterizes the

selected testimony of Mr. Chou, as it clearly does not demonstrate what is "typical" when a party

purchases HALLMARK Branded Greeting Cards. Rather, Mr. Chou's comments with respect to

the price he paid concerned Dickens' purchase of closeout cards from another card manufacturer,

Gartner. (Bernstein Dec. II ¶6, Ex. E (Chou Dep. III:128-24-131:14)).

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Mr. Goodman

testified that Northstar paid a "bulk rate" of $10 per ton for the HALLMARK Branded Greeting

Cards that were sold to Square Peg.  2017 Goodman Decl. at ¶12; Goodman Dep. at 113:19-24

(Ex. F).  Furthermore, Mr. Goodman admitted that Northstar never paid Hallmark the $10/ton remittance for probably the majority of the cards it diverted and sold to Square Peg. 2019 Goodman Decl. at ¶7. HALLMARK Branded Greeting Cards that are sold "in commerce" are sold at a price per card, *not* a per ton or bulk rate. Katz Suppl. Decl. at ¶4.

64.     Hallmark did not authorize the illicit sale of the HALLMARK Branded Greeting Cards from Northstar to Square Peg. Goodman Dep. at 57:4-14 (Northstar "was not permitted to sell ... the cards for reuse") (Ex. F); Katz Decl. ¶12.

**Dickens' Response to Hallmark's Asserted Fact:** Denied. The referenced cards were not the subject of an illicit sale, as Northstar purchased them lawfully from Hallmark. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24), ¶19, Ex. R. (Riley Dep. 40:22 – 41:11)). Northstar did not require Hallmark's authorization to re-sell the cards that it had purchased and for which it had obtained title.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Dickens' response, which disputes whether it was in the lawful possession of the HALLMARK Branded Greeting Cards, is a legal issue that is inappropriate to address in a Rule 56.1 statement.  *See Costello,* 783 F.Supp.2d at 661 n. 5.  Hallmark further disputes that "Northstar purchased them lawfully from Hallmark." *See* Hallmark's Opening Brief at 5-8, 16-20.

65.     Nor did Hallmark authorize the sale of the HALLMARK Branded Greeting Cards from Square Peg to Dickens. Katz Decl. ¶12.

**Dickens' Response to Hallmark's Asserted Fact:** Denied.  Hallmark had  no legal authority to either grant or deny Square Peg the right to sell HALLMARK Branded Greeting Cards to Dickens once Hallmark sold and transferred title to the HALLMARK Branded Greeting

cards to Northstar, in at a minimum, 2014 and 2015. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24)).

        **Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Dickens' response, which contends that Hallmark had "no legal authority to either grant or deny Square Peg the right to sell HALLMARK Branded Greeting Cards to Dickens," is a legal issue that is inappropriate to address in a Rule 56.1 statement. *See Costello,* 783 F.Supp.2d at 661 n. 5. Hallmark further disputes that "Hallmark sold and transferred title to the HALLMARK Branded Greeting cards to Northstar . . . ." *See* Hallmark's Opening Brief at 5-8, 16-20.

66.    Hallmark did not authorize any of Dickens' sales of HALLMARK Branded Greeting Cards. *Id.*

        **Dickens' Response to Hallmark's Asserted Fact**: Denied.  Hallmark had no legal authority to either grant or deny Dickens the right to sell HALLMARK Branded Greeting Cards to anyone once Hallmark sold and transferred title to the HALLMARK Branded Greeting cards to Northstar, in at a minimum, 2014 and 2015. (Bernstein Dec. I ¶18, Ex. Q (Goodman Dep. 112:25 – 113:24)).

        **Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Dickens' response, which contends that Hallmark had "no legal authority to either grant or deny Dickens the right to sell HALLMARK Branded Greeting Cards to anyone," is a legal issue that is inappropriate to address in a Rule 56.1 statement. *See Costello,* 783 F.Supp.2d at 661 n. 5. Hallmark further disputes that "Hallmark sold and transferred title to the HALLMARK Branded Greeting cards to Northstar . . . ." *See* Hallmark's Opening Brief at 5-8, 16-20.

67.    Throughout 2017, Dickens had a marketing strategy focused on damaging Hallmark. Chou Dep. III at 308:21-309:15, 329:7-330:8 (Ex. E).

**Dickens' Response to Hallmark's Asserted Fact:** Denied. This assertion mischaracterizes Mr. Chou's Rule 30(b)(6) testimony on behalf of Dickens. Dickens has repeatedly conceded Hallmark is a competitor of Dickens. (Berkley Dec. ¶ 16, Ex. O (Chou Dep. II: 534:20-22); . ¶6, Ex. E (Chou Dep. III: 275:7-12)). The portions of Dickens' statements excerpted and referenced by Hallmark merely demonstrate that Dickens would attempt to sell its products to stores selling Hallmark products, in an effort to expand its business, which makes Dickens no different from any other competitor. The excerpted portions of the testimony do not evidence a specific intent to "harm" Hallmark.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:** Mr. Chou made his long-held animus towards Hallmark and desire to damage Hallmark clear throughout Dickens' 30(b)(6) deposition. *See, e.g.,* Chou Dep. I at 59:7-15 (Ex. D) (admitting that he viewed Hallmark as "an evil giant" and that he "really dislike[s] Hallmark"); *Id.* at 310:25-311:7 (Ex. D) (noting that this litigation has presented him with "a lifetime opportunity" to get "justice" and the ability to "fight against the evil giant") (Ex. D); Chou Dep. III at 324:6-9; 327:20-328:3; 468:21-24 (Ex. E) (recognizing that selling HALLMARK Branded Greeting Cards at a huge discount could harm the Hallmark brand). He also made his intent to harm the Hallmark brand clear to Hallmark's primary competitor, American Greetings, when he wrote, "With such a huge volume of Hallmark cards dumping into the market, I believe the market will be in a turmoil, and *the Hallmark brand will be seriously damaged. If I can secure more Hallmark cards at 10 cents apiece, I can sell the cards to Hallmark stores at huge discount, and open many new opportunities for me to sell more AG/Gibson cards to Hallmark stores at regular prices in the future.*" Berkley Decl. at Ex. P (emphasis added).

68.     Dickens admitted that the unique opportunity to purchase the HALLMARK Branded Greeting Cards significantly facilitated its plan to harm Hallmark. Chou III at 437:2-438:13 (Ex. E).

**Dickens' Response to Hallmark's Asserted Fact:** Denied.   First,   the   pages included in support of this assertion were not actually attached as an Exhibit to the Brian Berkley Declaration, Ex. E. Nonetheless, the excerpt referred to in the deposition mischaracterizes the nature of Mr. Chou's Rule 30(b)(6) testimony on behalf of Dickens. Dickens has repeatedly conceded Hallmark is a competitor of Dickens. (Berkley Dec. ¶ 16, Ex. O (Chou Dep. II:534:20-22); ¶6, Ex. E (Chou Dep. III:275:7-12)). The portions of Dickens' statements excerpted and referenced by Hallmark merely demonstrate that Dickens would attempt to sell its products to stores selling Hallmark products, in an effort to expand its business, which makes Dickens no different from any other competitor. The excerpted portions of the testimony do not evidence a specific intent to "harm" Hallmark.

**Hallmark's Response to Dickens' Denial of Hallmark's Facts:**  Mr. Chou made his long-held animus towards Hallmark and desire to damage Hallmark clear throughout Dickens' 30(b)(6) deposition.  *See, e.g.,* Chou Dep. I at 59:7-15 (Ex. D) (admitting that he viewed Hallmark as "an evil giant" and that he "really dislike[s] Hallmark"); *Id.* at 310:25-311:7 (Ex. D) (noting that this litigation has presented him with "a lifetime opportunity" to get "justice" and the ability to "fight against the evil giant") (Ex. D);  Chou Dep. III at 324:6-9; 327:20-328:3; 468:21-24 (Ex. E) (recognizing that selling HALLMARK Branded Greeting Cards at a huge discount could harm the Hallmark brand).  He also made his intent to harm the Hallmark brand clear to Hallmark's primary competitor, American Greetings, when he wrote, "With such a huge volume of Hallmark cards dumping into the market, I believe the market will be in a turmoil, and ***the Hallmark brand***

34

**will be seriously damaged. If I can secure more Hallmark cards at 10 cents apiece, I can sell the cards to Hallmark stores at huge discount, and open many new opportunities for me to sell more AG/Gibson cards to Hallmark stores at regular prices in the future.**" Berkley Decl. at Ex. P (emphasis added). Hallmark has attached the referenced pages of Chou Dep. III that were mistakenly omitted from its Opening Brief. *See* Berkley Reply Decl. at Ex. 5 (437:2-438:13).

### HALLMARK'S REPLY TO DICKENS' COUNTER 56.1 STATEMENT OF MATERIAL FACTS

69.     Dickens has previously bought millions of greeting cards and other products from Hallmark via Hallmark's agent "Event Sales." (Chou Dec. II ¶2, Ex. A).

**Hallmark's Response:** Denied as misleading because while Dickens did purchase greeting cards and other products from Hallmark via Hallmark's exclusive closeout broker, Event Sales, more than ten years ago, the documentation in Exhibit A does not provide sufficient information to establish whether any of the counter cards referenced in Exhibit A fall within the definition of "HALLMARK Branded Greeting Cards" as set forth in paragraph 3 of Mr. Katz's June 24, 2019 Declaration, and as that phrase is used in Hallmark's Opening and Reply Briefs. Katz Suppl. Decl. at ¶2. Moreover, Tony Hofstede testified that in 33 years of Event Sales exclusively representing Hallmark, Event Sales has never been allowed to broker HALLMARK Branded Greeting Cards, (seasonal and everyday counter cards), as that phrase is defined in paragraph 3 of Mr. Katz's June 24, 2019 Declaration and as that phrase is used in Hallmark's Opening and Reply Briefs. Hofstede Decl. at ¶6.

70.     Many of the shipments of greeting cards and other products, referenced in the preceding paragraph, were sent to Dickens directly from Hallmark, and in fact, Dickens at times paid Hallmark directly for such cards and products. (Chou Dec. II ¶2, Ex. A).

**Hallmark's Response:** Denied as misleading because the documentation in Exhibit A does not provide sufficient information to establish that the products referenced in Exhibit A, all of which were ordered more than 10 years ago, were "HALLMARK Branded Greeting Cards" as defined in paragraph 3 of Mr. Katz's June 24, 2019 Declaration, and as that phrase is used in Hallmark's Opening and Reply Briefs. Katz Suppl. Decl. at ¶2. Moreover, Tony Hofstede testified that in 33 years of Event Sales exclusively representing Hallmark, Event Sales has never been allowed to broker HALLMARK Branded Greeting Cards, as that phrase is defined in paragraph 3 of Mr. Katz's June 24, 2019 Declaration and as that phrase is used in Hallmark's Opening and Reply Briefs. Hofstede Decl. at ¶6.

71.     Dickens paid Hallmark, via Event Sales, as little as 2 cents per card for Dayspring brand cards. (Chou Dec. II ¶2, Ex. A).

**Hallmark's Response:** Denied as misleading because the 2 cents per card Dickens paid Event Sales were for the Dayspring brand cards, which are *not* the HALLMARK Branded Greeting Cards at issue in this litigation. Katz Suppl. Decl. at ¶3.

72.     At the time Dickens contacted Event Sales on March 13, 2017, it knew that Event Sales was an authorized seller of closeout products for Hallmark. However, Dickens did not know, at that time, or prior to purchasing the Subject Hallmark Greeting Cards from Square Peg that Event Sales was allegedly the exclusive dealer of Hallmark closeout products. (Chou Dec. II ¶4).

**Hallmark's Response:** Denied. In his declaration, Tony Hofstede testified that it was well known in the personal expression industry that Event Sales was the exclusive broker for Hallmark, Hofstede Decl. at ¶8, and Dickens has done business in the personal expression industry since at least the early 1980s.

36

73.     Dickens emailed Jeff Drum, Marketing Development & Distribution Planning Director of Hallmark on March 24, 2017 stating that "Many of my customers have received the attached email for 50 Cents Hallmark cards and made purchases, couple broker in ASD show in Vegas also approached us for even much lower prices if we buy in volume. Do you know who I should contact in your company to buy the cards?" (Chou Dec. II ¶5, Ex. C).

    **Hallmark's Response:** Admitted.

74.     Dickens would not have contacted Tony Hofstede of Event Sales nor Jeff Drum of Hallmark unless it believed that the purchase from Square Peg was legitimate, and that more legitimate Hallmark closeout products, including greeting cards, were available in the market. (Chou Dec. II ¶6).

    **Hallmark's Response:** Denied. Mr. Chou's email to Hallmark's Jeff Drum "inquiring" as to whether he could purchase "50 Cents Hallmark cards" was a ruse, as he had already acquired his trailer loads of cards from Square Peg and knew very well that Hallmark's exclusive closeout broker had not sanctioned their release into the market. Hofstede Decl. at Ex. A. Mr. Chou further misled Event Sales when he was asked in a March 13, 2017 email from Event Sales whether he knew the source of the greeting cards, and he responded that he did not know the source when in fact he knew at the time that the source was Square Peg. Hofstede Decl. at Ex. A.

75.     Dickens had not heard of Northstar at the time it purchased the Subject Hallmark Greeting Cards from Dickens. (Chou Dec. II ¶10, Ex. G).

    **Hallmark's Response:** Admitted.

76.     Dickens frequently receives unsolicited calls from prospective vendors not previously known to Dickens. (Bernstein Dec. II ¶5, Ex. D (Wagner Dep. 38:20-22)).

**Hallmark's Response:** Denied. The referenced portion of Mr. Wagner's deposition testimony does not indicate that he did not previously know the vendors from whom he was receiving calls. Rather, Mr. Wagner testified "a lot of the closeout people *I deal with* . . .", thereby signifying that such vendors *are,* in fact, previously known to Dickens. Wagner Dep. at 38:9-11 (emphasis added) (Ex. 4). Square Peg was not previously known to Dickens, as Mr. Wagner testified that he had no prior relationship with Mike Riley of Square Peg. *Id.* at 36:14-16 (Ex. 4).

77.    Michael Riley ("Riley") of Square Peg visited Dickens to discuss the potential sale of the Subject Hallmark Greeting cards on February 13, 2017. During this meeting, Mr. Chou and Ken Wagner ("Wagner") questioned Riley extensively about his personal background and his company, Square Peg. Riley advised Wagner that Riley owned nine stores in Lake George and Martha's Vineyard. Riley further advised that he and his brother had recently purchased a parking lot in Martha's Vineyard that his son was going to run for him. Wagner was further advised by Riley that Riley's businesses in Lake George and Martha's Vineyard were busier during the summer months and that because things were slower during the winter, that Riley and his brother started buying and selling closeout items. (Bernstein Dec. II ¶5, Ex. D (Wagner: 51:17-55:23)).

**Hallmark's Response:** Denied. Mr. Chou and Mr. Wagner did not question Riley "extensively" about his background and company (and the deposition pages cited by Dickens do not support this contention).   In fact, Mr. Wagner noted in his deposition that he was not an active participant in the discussion, remarking, "I was just kind of sitting there absorbing and kind of researching while he was talking." Wagner Dep. at 53:10-13 (Ex. 4).

78.    During this meeting, Wagner reviewed Square Peg's website prior to agreeing to purchase the Subject Hallmark Greeting Cards, and learned that Square Peg sold closeout items in

the nature of party goods including, at a minimum, paper plates and napkins, as well as knives. (Bernstein Dec. II ¶5, Ex. D (Wagner: 53:22-54:2, 54:9 – 54:17)).

**Hallmark's Response:** Admitted.

79. Riley informed Chou and Wagner during this meeting that he obtained the Subject Hallmark Greeting Cards from Hallmark's Enfield Facility which had closed down, as there was extra merchandise at Enfield that could not be absorbed in Hallmark's Kansas City office. (Bernstein Dec. II ¶5, Ex. D (Wagner: 58:19-22)).

**Hallmark's Response:** Admitted.

80. Only after Riley's conversation with Wagner and Chou, during which Wagner and Chou thoroughly vetted Riley and Square Peg, did Dickens agree to purchase the Subject Hallmark Greeting Cards for 10 cents apiece. (Bernstein Dec. II ¶5, Ex. D (Wagner: 62:3-8)).

**Hallmark's Response:** Denied. Wagner and Chou did not "thoroughly" vet Riley and Square Peg, nor does the cited deposition testimony support this contention. Hallmark admits that Dickens agreed to purchase the HALLMARK Brand Greeting Cards from Square Peg for 10 cents per card.

81. Dickens gave Riley a check for $10,000 in exchange for Riley's promise that Square Peg would send Dickens $60,000 in merchandise. (Bernstein Dec. II ¶5, Ex. D (Wagner: 63:25-65:22)).

**Hallmark's Response:** Admitted.

82. Prior to the purchase of the Subject Hallmark Greeting Cards, Dickens had previously purchased products when "large brand owners closed their distribution facilities," including from a company called Sangamon. (Bernstein Dec. II ¶5, Ex. D (Wagner: 109:22-110:8)).

**Hallmark's Response**: Denied as misleading and irrelevant because Sangamon greeting cards are not at issue in this litigation and do not fall within the definition of HALLMARK Branded Greeting Cards that are at issue in this litigation. *See* Katz Suppl. Decl. at ¶3.

83. Prior to the purchase of the Subject Hallmark Greeting cards, Dickens purchased closeout greetings from "Design Design", a full price greeting card company, for eight cents apiece. (Bernstein Dec. II ¶5, Ex. D (Wagner: 110:9-113:4)).

**Hallmark's Response:** Denied as misleading and irrelevant because Design Design greeting cards and "closeout greeting cards" are not at issue in this litigation and do not fall within the definition of HALLMARK Branded Greeting Cards that are at issue in this litigation. *See* Katz Suppl. Decl. at ¶3.

84. On February 7, 2017, prior to the purchase of the Subject Hallmark Greeting Cards, Dickens was approached by a representative of Gartner cards offering to sell 6.9 million pieces of greeting cards in exchange for $100,000. Dickens agreed to purchase 3 million pieces for 1.5 cents apiece, with an option to buy the remainder of the cards. (Chou Dec. II, ¶7, Ex. D).

**Hallmark's Response:** Denied as misleading and irrelevant because Gartner greeting cards are not at issue in this litigation and do not fall within the definition of HALLMARK Branded Greeting Cards that are at issue in this litigation. *See* Katz Suppl. Decl. at ¶3.

85. Prior to the purchase of the Subject Hallmark Greeting Cards, a representative of United Pacific Designs ("UPD"), an industry closeout vendor, approached Dickens offering to sell Dickens "Image Art" brand cards, a product line owned by Hallmark, for 8 cents apiece. On March 29, this same representative of UPD followed up with Dickens offering to sell these same cards to Dickens for 5 cents apiece. (Chou Dec. II, ¶8, Ex. E).

**Hallmark's Response**: Denied as misleading and irrelevant because Image Art greeting cards and "closeout greeting cards" are not at issue in this litigation and do not fall within the definition of HALLMARK Branded Greeting Cards that are at issue in this litigation. *See* Katz Suppl. Decl. at ¶3.

86.    In March 2017, Dickens sold certain of the Subject Hallmark Greeting Cards to many stores, including East Islip & Gift, located at 64 East Main Street in East Islip, NY and Party Palace located at 695 Route 112, Patchogue, NY. (Chou Dec. II, ¶3, Ex. B).

**Hallmark's Response**: Admitted.

87.    East Islip & Gift and Party Palace are Hallmark stores that currently sell Hallmark Branded Greeting Cards and pornographic magazines in the same store. (Declaration of Paul Voisin ¶¶3-7, Exs. A – E).

**Hallmark's Response:** Admitted that the two stores mentioned sell Hallmark products, including greeting cards, but neither are Hallmark Gold Crown stores.

88.    Atul Patel, the owner of Hallmark Gold Crown Store "Celebration Hallmark", emailed Hallmark's employee Tony Barbella to advise that "[N]early the entire collection (of cards sold by Dickens to nearby stores) is active Hallmark cards which would be found in my control. They include all everyday, Mahogany, Spanish, Tree of Life and all seasons." (Bernstein Dec. ¶4, Ex. C).

**Hallmark's Response**: Admitted that Atul Patel wrote an email that contains the above quote. The email is admissible hearsay.  Also, the email contains the completely inaccurate statement that Hallmark sold 30 trailers of cards to Dickens.  Mr. Patel does not define what he means when he uses the term "active" and Dickens chose not to depose him to clarify what he meant when using that term. Finally, Mr. Patel is referring to cards he bought and thus controls as

an independent retailer, but he does not speak for Hallmark (the mark holder) with respect to cards

Hallmark has the right to control, the latter of which are the cards at issue in this litigation.

89.     In March 2017, Dickens was openly advertising and selling the Hallmark branded

greeting cards it purchased from Square Peg to its customers and on its website. (Chou Dec. II

¶9, Ex. F).

**Hallmark's Response:** Admitted.

Date:  August 5, 2019                    FOX ROTHSCHILD LLP

/s/ Jeffrey J. Bouslog
Jeffrey J. Bouslog, Esq. (admitted *pro hac vice*)
222 South Ninth Street, Suite 2000
Minneapolis, Minnesota 55402
Telephone:     (612) 607-7000
Facsimile:     (612) 607-7100

Brian Berkley, Esq. (admitted *pro hac vice*)
Ryan N. Miller, Esq.
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
Telephone:     (215)-299-2000
Facsimile:     (215) 299-2150

Alexandra L. Sobol, Esq.
101 Park Avenue, 17th Floor
New York, New York 10178
Telephone:     (212) 878-7900
Facsimile:     (212) 692-0940

*Attorneys for Plaintiffs Hallmark Licensing, LLC*
*and Hallmark Marketing Company, LLC*