UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
HALLMARK LICENSING, LLC, et al.,

                            Plaintiffs,                **REPORT AND RECOMMENDATION**

       -against-                      CV 17-2149 (SJF)(AYS)

DICKENS, INC.,

                            Defendant.
-------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

Plaintiffs Hallmark Licensing, LLC and Hallmark Marketing Company, LLC (collectively, "Hallmark") commenced this action against Defendant Dickens, Inc. ("Dickens.") alleging federal claims of trademark infringement, trademark dilution, and unfair competition, and state law claims for deceptive trade practices and common law unfair competition. Hallmark's claims arise from Dickens's efforts to sell a large quantity of greeting cards that it acquired from a third party. Dickens, a competitor of Hallmark, claims that its purchase of the cards gives it the unfettered right to sell them as it sees fit. The sale of the cards is currently preliminarily enjoined upon consent of the parties.

Presently before the Court, on referral from the Honorable Sandra J. Feuerstein for report and recommendation, are the parties' cross-motions for summary judgment. Alleging that the sale of the Cards would violate its rights as the owner of the Hallmark trademark, Hallmark seeks partial summary judgment on its trademark infringement and trademark dilution claims. Docket Entry herein ("DE") 92. Dickens seeks summary judgment as to all of Hallmark's claims on the ground that all claims are barred by the "first sale" doctrine. DE 114. For the following reasons, this Court respectfully recommends that Hallmark's motion be granted, and that Dickens's motion be denied.

# FACTUAL BACKGROUND

## I.     Basis of Facts Recited Herein

In support of their motions, Plaintiffs and Defendant have filed statements of facts in accordance with Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1"). Under Rule 56.1, a party moving for summary judgment is required to submit a statement of material facts as to which the moving party contends there is no genuine fact to be tried. A party opposing summary judgment must submit its own counter-statement of facts, setting forth areas of agreement, as well as those to which there is dispute. As further required by Rule 56.1, each statement set forth by the moving party or opponent must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).

The Court now turns to discuss the facts revealed by the documents described above. Unless otherwise indicated, the facts recited below are undisputed.

## II.    The Parties

Hallmark is the top selling greeting card manufacturer in the United States. DE 101 (Plaintiffs' Local Rule 56.1 Statement of Material Facts) ¶ 1. Along with its related companies Hallmark creates and distributes greeting cards and other personal expression products under its well-known and famous Hallmark trademark. Id. ¶ 2. Dickens has stipulated that Hallmark is a "famous" mark. Id. ¶ 3.

Hallmark has spent hundreds of millions of dollars in the marketing and advertising of its Hallmark Branded Greeting Cards. Id. ¶ 7. The Hallmark brand is one of Hallmark's most important assets. Id. ¶ 8. As set forth in the declaration of their associate general counsel, "Hallmark undertakes significant measures to control the quality of both the manufacture and

distribution of its products to ensure that consumers who see the HALLMARK mark at retail are assured the products are of the utmost quality and properly presented." DE 94 (Barry Katz Decl.) ¶ 6. The ongoing success of Hallmark's products is due, in significant part, to the quality of Hallmark Branded Greeting Cards as well as Hallmark's extensive and continuous efforts to promote the Hallmark brand. DE 101 ¶ 10.

Hallmark Cards Incorporated ("HCI") is the owner of the federally registered and famous "Hallmark" trademark, which it licenses to the Plaintiffs herein. DE 94 ¶ 5. Hallmark distributes cards and other "personal expression" items under the Hallmark "mark and crown design." Id. ¶ 4. The cards at issue in this lawsuit (the "Subject Cards") are seasonal and everyday individual cards known as "counter" cards, which bear the Hallmark name. Id. ¶ 3. The Subject Cards are distinguished from "boxed" cards, which are sold in boxes, as well as other cards sold by Hallmark which do not bear the Hallmark name. Id.

Hallmark Branded Greeting cards, including the Subject Cards, are sold throughout the United States in Hallmark specialty stores and other retail outlets with which Hallmark chooses to do business. DE 101 ¶ 11. To further promote its brand, Hallmark has established a retail network, known as Hallmark Gold Crown, consisting of over 1600 stores. Id. ¶ 12. In addition to Gold Crown stores, Hallmark sells Hallmark Branded cards to non-Gold Crown retailers, chosen by Hallmark, which offer for sale a selected portion of the Hallmark card lines and products. Id. ¶ 13. These non-Gold Crown stores include a wide variety of retail operations of Hallmark's choosing, which in Hallmark's judgment, are capable of offering the right environment for the Hallmark brand. Id. ¶ 14. Accordingly, Hallmark has significant control over the sale and distribution of its products, including the Subject Cards. Id. ¶ 15.

Defendant Dickens describes itself as the "largest distributor of greeting cards and social stationery in the country." DE (Defendant's Statement of Opposing Facts Under Local Rule 56.1)[1] 106 ¶ 21. Dickens is owned by James Chou ("Chou"). Id. ¶ 58. Dickens's largest supplier, American Greetings, is also Hallmark's most significant competitor. Id. ¶ 22. Dickens is engaged in the business of distributing a number of different branded greeting cards. Brands distributed by Dickens include those sold under the American Greetings, Gartner Greetings, Freedom Greeting, and DesignDesign names. Id. ¶ 21. Dickens alleges that he has also sold cards bearing the Hallmark name.

III.  Close Out Vendors and Secondary Market Sales

"Close-out vendors" are defined by the parties as retailers that obtain discounted or otherwise outdated merchandise, including greeting cards. These vendors then sell the merchandise to wholesalers in the secondary market, or to retailers at prices lower than those offered by the manufacturer. Id. ¶16. Hallmark states that with certain limitations not relevant to the sale of counter cards like the Subject Cards, Hallmark did not, and does not, sell Hallmark branded greeting cards in the closeout or secondary markets. Dickens denies this statement of fact. Id. ¶18.

Hallmark's position regarding secondary market sales is supported by a Declaration of Tony Hofstede ("Hofstede"). DE 97. Hofstede is the President of Event Sales, a company that works with retailers, like Hallmark, to broker the sale of excess merchandise. DE 97 ¶¶ 1–3. Hofstede has worked with Hallmark for thirty-three years as a broker for sales of certain Hallmark merchandise. Id. ¶ 6. Hallmark places restrictions on the type of merchandise that may be

---

[1]     References to Defendant's Statement of Opposing Facts Under Local Rule 56.1 may refer to the cited paragraph as well as Plaintiffs' response to the cited paragraph.

brokered for sale by Event Sales. Id. ¶ 5. Hallmark also restricts the stores to which some items may be sold, as well as the manner in which they may be advertised. Notably, Hallmark does not allow the sale of brokered merchandise to its network of Hallmark outlets. Id. ¶ 9. Nor does it allow stores obtaining such merchandise to advertise using the Hallmark name. Id. Further, merchandise brokered for sale does not include the type of cards that are the subject of this action. Id. ¶ 6.

In contrast to Hallmark's clear delineation of the type of products the company will allow to enter the secondary market (and the terms for any entry) Defendant's denial of Hallmark's statement is supported only by Dickens's version of the facts in this case. Thus, denying Hallmark's statement as to secondary market sales, Dickens states that "Hallmark sold, and transferred title to, the Hallmark branded cards to Northstar . . . ." DE 106 ¶ 23.[2]

IV.    Hallmark's Product Destruction Policies and Relationship with Northstar

Plaintiffs submit the declaration of a former Hallmark employee, Jeff Moser ("Moser"), who describes Hallmark's process for destroying discarded Hallmark cards.  DE 96 ¶ 1.  Moser worked as a "Strategic Buyer" at Hallmark from September 1, 1999 through January 1, 2012.  Id. As a Strategic Buyer, Moser arranged for trash hailing and product discards. Id. Moser declares that Hallmark's "policy and practice regarding greeting card product discards was to always make sure the product was destroyed and unsaleable as greeting cards."  Id.

In the early 2000's, Hallmark began a relationship with Northstar Pulp & Paper Company, Inc. ("Northstar") to provide disposal services to Hallmark's Enfield Distribution Center ("Enfield"). DE 101 ¶ 24. Later, Northstar began to recycle Hallmark greeting cards and other

---

[2]    The parties disagree as to whether Hallmark sells other products, such as gift wrap, not at issue in this lawsuit, on any secondary market. As those products are not at issue, the parties' disagreements do not concern any material facts, and are therefore not recited herein.

products, including HALLMARK branded cards, into paper pulp that Northstar would then sell to paper mills. Id. ¶ 25.

On May 21, 2012, Hallmark and NorthStar executed an Enterprise Agreement (the "Enterprise Agreement" or the "EA"). Id. ¶ 26. The Enterprise Agreement states, ". . . Company [Hallmark] shall purchase from Supplier [Northstar] and Supplier shall sell to Company the products and services generally described on Exhibit A hereto pursuant to (a) Purchase Orders submitted by Company to Supplier hereunder and (b) Specifications established by Company from time to time. . . ." DE 98 (Vangsness Decl.) Ex. 1 at § 1. Thus, the Enterprise Agreement provides for Northstar to sell, inter alia, services to Hallmark. The EA includes an Exhibit A which is entitled "Specifications, Products, Services and Prices." Id. at Ex. A. Exhibit A lists "Compactor Rentals" as well as "Recycling Purchase Products and Pricing." Id. For example, Exhibit A to the Enterprise Agreement lists a price of $55 Official Board Market ("OBM") for "Baled Card Stock" and a price of $10 OBM for "Sorted White Ledge." Id.

When asked to explain Northstar's relationship with Hallmark, Northstar's treasurer Aaron Goodman ("Goodman") explained that "[o]ur agreement with Hallmark is quite clear that we are only to recycle the product, and we are not to resell the product. DE 93 (Berkley Decl.) Ex. F at 150:19–25. Thus, Goodman also testified that Northstar "purchased" materials from Hallmark for recycling. DE 93 Ex. F at 20:13–19. In particular, when asked whether Hallmark sold greeting cards to Northstar, and whether it sold those cards "for recycling or converting as you understood the Northstar/Hallmark relationship," Goodman responded "Recycling." DE 93 Ex. F at 20:13–25. Goodman further explained:

> When we are purchasing for recycling, we are taking the material to our plant. We are typically either shredding or just bailing the material. And then we are selling it to a paper mill who will repulp the material, which is put into a large pulper, extract the fiber from

> this, and use it to – for a variety of different uses depending on the
> paper mill.

Id. 19:13–23.

Northstar would provide a number of documents to Hallmark through the course of the recycling process, including: (1) a "scale ticket" which reports the official weight of a particular delivery of card stock; (2) a "buy/sell" which reports details on the purchases made from Hallmark in the stated month, including the grades, weights, and prices per respective grade; and (3) a receiving report which details all the material Northstar received from Hallmark, and their respective weights, from each load. DE 101 ¶ 31. Goodman also explained that Northstar would prepare a "shipping statement" report on a monthly basis and submit to Plaintiff and other suppliers. DE 93 Ex. F at 68:4–20.

V.      The Enfield Distribution Center and Northstar's Possession of the Subject Cards

On July 7, 2015, Hallmark announced that the Enfield Distribution Center would close on or about June 30, 2016. DE 101 ¶ 32. As noted, Hallmark had an agreement with Northstar with respect to disposal services for material at this distribution center. In the months leading up to the closure, Hallmark commenced a process of determining what inventory items located at Enfield would be transferred to its Liberty Distribution Center in Missouri for sale in commerce through Hallmark's retailer network. Id. ¶ 33. Approximately 80% of the inventory at Enfield was transferred to Liberty. Id. ¶ 34. The outstanding inventory remained with Northstar. DE 106 ¶ 35.

Northstar was informed of Enfield's closure and the consequent increased volume of recycling in the summer of 2015.  Id. ¶ 36.  After making decisions about the transfer of product to its Liberty Distribution Center, Northstar was left with 73 trailer loads of Enfield inventory. Id.  Hallmark contends that the trailers were "entrusted to Northstar for destruction pursuant to

the Enterprise Agreement." DE 106 ¶ 35. Dickens argues that Hallmark "sold and transferred title" to the cards to Northstar.  Id.

VI.　　Northstar Sells Inventory to Square Peg, Which Sells it to Dickens

Northstar sold the 73 trailers of inventory to Square Peg, LLC ("Square Peg") for approximately $194,000 in 2016. DE 127 ¶ 32. The transaction was not reflected in Northstar's books. DE 100 (Goodman Decl.) ¶ 11. There was no formal contract respecting its terms, no emails, no text messages, or any other documentation. Id. It is clear, however, that Northstar instructed Square Peg not to sell any cards until after the Enfield Distribution Center was closed. DE 106 ¶ 41.

In late January, 2017, Square Peg's Michael Riley ("Riley") contacted Ken Wagner, Vice President of marketing at Dickens ("Wagner"), to sell "closeout" Hallmark products.  Id. ¶ 43. Dickens negotiated a deal with Square Peg to purchase approximately 20 trailer loads of Hallmark greeting cards.  Id. ¶ 45.  Hallmark states that "Dickens made no effort to understand how Square Peg was able to acquire the cards, beyond Mr. Riley's self-serving statement that the cards were not 'stolen'." Id. ¶ 46. Dickens did not make any attempt to independently verify with Hallmark that Square Peg had title or authority to sell the cards before negotiating the purchase. Id. ¶ 47. Hostede, who, as noted, is the President of Event Sales, Inc., submitted a declaration and included an email from Chou. In that email Chou states that he heard Hallmark released "a lot of closeout unopened pack counter cards" and asks whether they were available from Event Sales. DE 97 (Hostede Decl.) Ex. A. Hostede responded that such cards were not available from Event Sales. DE 97 ¶ 10.

As of the time when this litigation commenced, Square Peg had shipped approximately 1,551,988 of the Subject Cards to Dickens. DE 127 ¶ 37. Dickens began selling the cards in

March of 2017. Id. ¶ 39. Dickens did not alter the Subject Cards in any way prior to their sale.

Id. ¶ 42. It offered them to all of its customers without any restrictions, including stores that sell

pornography, and other types of unseemly merchandise with which Hallmark does not wish its

brand to be associated. DE 106 ¶ 49. Gold Crown retailers communicated to Hallmark sales staff

via telephone and e-mail, and made clear that Hallmark's business would be harmed by the

Dickens's discounted sales of Hallmark branded greeting cards. Id. ¶ 51.

Dickens admits that it sold goods with the Hallmark trademark. Id. ¶ 56. It admits that it is a

competitor of Hallmark, and admits it sells competitive goods.  Id. ¶ 57.  Chou, Dickens's owner,

stated his belief that Hallmark is "an evil giant," and testified that he "really dislike[d]

Hallmark."  Id. ¶ 58 (citing Chou deposition). After Chou learned that he had an opportunity to

purchase Hallmark branded greeting cards (presumably from Square Peg) he wrote to American

Greetings, his primary supplier and Hallmark's main competitor, stating:

> With such a huge volume of Hallmark cards dumping into the
> market, I believe the market will be in a turmoil, and the Hallmark
> brand will be seriously damaged.  If I can secure more Hallmark
> cards at 10 cents apiece, I can sell the cards to Hallmark stores at a
> huge discount, and open many new opportunities for me to sell
> more AG/Gibson cards to Hallmark stores at regular prices in the
> future.

Id. ¶ 60.

VII.    Hallmark Commences this Action

On April 10, 2017, within weeks of learning that Dickens was selling HALLMARK

branded greeting cards, Hallmark commenced this action, and sought preliminary injunctive

relief. DE 1. On the day of the preliminary injunction hearing, Dickens agreed to voluntary

restraints, which, among other obligations, prohibited Dickens from selling or offering to sell the

HALLMARK branded greeting cards it purchased from Square Peg. DE 101 ¶ 54. In a separate

action filed by Hallmark against Square Peg, Square Peg agreed to transfer all of the Hallmark

branded greeting cards in its possession to Northstar to be destroyed under Hallmark's supervision. Id. ¶ 55.

Having outlined all relevant facts, the Court turns to the merits of the parties' motions.

<u>DISCUSSION</u>

I.    <u>Legal Principles: Standards on Summary Judgment</u>

Summary judgment is appropriately granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" <u>Baldwin v. EMI Feist Catalog, Inc.</u>, 805 F.3d 18, 25 (2d Cir. 2015) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," <u>Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay</u>, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations, and citation omitted). Thus, the Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." <u>Davis-Garett v. Urban Outfitters, Inc.</u>, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted).

"A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Pollard v. New York Methodist Hosp.</u>, 861 F.3d 374, 378 (2d Cir. 2017) (quoting <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. 2505). The burden of showing an absence of genuine dispute as to a material fact lies with the moving party. <u>CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP</u>, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets, and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." <u>Lyons v. Lancer Ins. Co.</u>, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets, and citation omitted).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" <u>Fabrikant v. French</u>, 691 F.3d 193, 205 (2d Cir. 2012) (quoting <u>Anderson</u>, 477 U.S. at 252); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." <u>DiStiso v. Cook</u>, 691 F.3d 226, 230 (2d Cir. 2012); <u>see also</u> <u>Federal Trade Comm'n v. Moses</u>, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); <u>Flores v. United States</u>, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations, and citations omitted)).

II.    <u>Defendant's Motion</u>

    A.    <u>Legal Principles: the First Sale Doctrine</u>

Dickens relies on the first sale doctrine to dispose of Hallmark's claims. Under the first sale doctrine, a trademark holder cannot pursue a Lanham Act claim against an alleged infringer after a qualifying "first sale" has occurred. <u>S&L Vitamins, Inc. v. Australian Gold, Inc.</u>, 521 F. Supp.

2d 188, 202 (E.D.N.Y. 2007) (where a "'purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation' under the Lanham Act") (quoting <u>Sebastian Int'l, Inc. v. Longs Drug Stores Corp.</u>, 53 F.3d 1073 (9th Cir. 1995). "Thus, a manufacturer who sells a branded product to a distributor *without restriction* cannot prevent the distributor from reselling the branded goods or demand that the distributor purchase a license or remove the mark." <u>Luxottica Grp. S.p.A. v. Bausch & Lomb Inc.</u>, 160 F. Supp. 2d 545, 552 (S.D.N.Y. 2001) (emphasis added).

To determine whether the first sale doctrine applies, a court must perform a two-part analysis. First, the court must determine whether the owner of the mark "authorized the first sale of the goods." If that element is met, the court must then determine consider the second element, <u>i.e.</u>, "whether the goods were genuine." <u>Ryan v. Volpone Stamp Co., Inc.</u>, 107 F. Supp. 2d 369, 382 (S.D.N.Y. 2000); <u>see</u> <u>also</u> <u>Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.</u>, 979 F. Supp. 224, 231 (S.D.N.Y. 1997) ("If the first sale by Mademoiselle was not authorized, then the garments cannot be genuine for infringement purposes."). If, after finding that the first sale was authorized, the court finds that the goods at issue were genuine, there is no violation of the Lanham Act, despite the fact that the goods were resold without the trademark owner's consent. If the goods were not genuine, <u>i.e.</u>, they were altered or not in accord with the trademark owner's quality standards, a valid claim for trademark infringement is established. Importantly, however, if the alleged first sale was not authorized, the court need not consider the second element of genuineness. The defense simply does not apply.

B.     Disposition of the Motion

Hallmark argues that there was no authorized "first sale" of the cards to Northstar. It also argues that, even if there was an authorized first sale, the goods were not genuine because they were not maintained within Hallmark's quality standards.

The alleged "first sale" at issue here is the transaction between Hallmark and Northstar pursuant to which Northstar took possession of the Subject Cards due to the closing of the Enfield Distribution Facility. Dickens argues that the transaction was an authorized first sale because Hallmark "sold" the Subject Cards to Northstar. Hallmark argues that there was no authorized "first sale" because Hallmark only provided the Subject Cards to Northstar so that Northstar could destroy the cards, meaning that the relationship between Hallmark and Northstar amounted to a bailor-bailee relationship and not to a sales transaction. As discussed below, Hallmark's characterization of its relationship with Northstar with respect to the Subject Cards is beyond any dispute.

The undisputed facts show that the Hallmark transferred the Subject Cards to Northstar with the restriction that Northstar would destroy the card stock through recycling. As such, the transaction is akin to a bailment, rather than a sale. A bailment is "the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it." Little, Brown and Co. (Inc.) v. American Paper Recycling Corp., 824 F. Supp. 11, 15 (1993) (citing Omni-Wave Elec. Corp. v. Marshall Indus., 127 F.R.D. 644, 650 (D. Mass. 1989)). As described below, the undisputed facts show that Hallmark delivered the Subject Cards to Northstar so that

Northstar would recycle (or destroy) the cards. This bailor-bailee relationship is not a sale within the meaning of the first sale doctrine.

There is no dispute that Northstar paid Hallmark for the Subject Cards by weight, and not per card. Thus, Northstar paid Hallmark approximately $10 per ton for the Subject Cards. Pl. Opp. at 9; Pl. Reply n.7; Def. Mot. at 4; 5. It is also undisputed that Northstar and Hallmark operated under the Enterprise Agreement.

There is no support for Dickens's contention that the transaction involving the Subject Cards somehow fell outside of the Enterprise Agreement. DE 116 ¶ 3. Paul Vangsness, Hallmark's strategic buyer who signed the Enterprise Agreement, explains that the section of Exhibit A to the Enterprise Agreement that is entitled "Recycling Purchase Products and Pricing" sets forth the payments Northstar would make to Hallmark "for Hallmark's *share of the proceeds* from Northstar's sale of recycled materials." DE 98 ¶ 5 (emphasis added). Vangsness also explained that Northstar's destruction of greeting cards for Hallmark "was a critical aspect of the Enterprise Agreement." Id. ¶ 3. Northstar's agreement with respect to the Subject Cards was clearly carried out pursuant to Exhibit A of the Enterprise Agreement which provides for payment based upon weight. The undisputed facts show that Hallmark provided the cards to Northstar so that Northstar would destroy the cards. The Enterprise Agreement and the parties' course of conduct reflected a relationship by which Northstar provided recycling services to Hallmark.

Dickens's citation to Goodman's deposition testimony for the proposition that Northstar "owned" the products and that they "purchased" them from Plaintiff is unavailing. See Def. Mot. at 3. Hallmark argues correctly that this lay testimony is insufficient to establish that, as a matter of law, Northstar owned the cards. See Cameron v. City of New York, 598 F.3d 50, 62

14

n.5 (2d Cir. 2010) ("the impropriety of allowing a lay witness to testify in the form of a legal conclusion is all the clearer."). In fact, Goodman testified that Hallmark sold greeting cards to Northstar so that Northstar could recycle those cards. Berkley Decl. Ex. F at 20:13–25. He also testified that "[o]ur agreement with Hallmark is quite clear that we are only to recycle the product, and we are not to resell the product." Id. at 150:19–25. Goodman testified that, at the time of the closure of the Enfield facility, Northstar supplied approximately 73 truckloads of Hallmark trademark greeting cards and other products "for destruction through recycling." Id. at 51:12–52:14.

Finally, the Court rejects Dickens's argument that "there is no evidence that Hallmark took any measures to ensure that the cards referenced in the shipping statements were actually destroyed." Dickens fails to provide any legal support for what appears to be its argument that the transaction was a sale unless Hallmark watched the destruction of each of the Subject Cards. Hallmark was not required to police Northstar's adherence to the parties' agreement. It was entitled to rely on the good faith execution of its agreement with Northstar, and not have to assume (as Dickens appears to argue) that Northstar would breach its contractual obligations.

In any event, Hallmark offers sworn statements from both Vangsness and Hallmark's former Strategic Buyer Jeff Moser explaining the process by which Hallmark, did, in fact, monitor Northstar's destruction of its greeting cards. Pl. Opp. at 4–5. For example, Moser stated that a Hallmark employee would initially follow Northstar to the facility to ensure that the cards were incinerated. Vangsness stated that he would periodically tour the Northstar facility to observe the destruction of greeting cards. Vangsness Decl. ¶ 4. Dickens's reliance on select testimony of Ronald Parodi, Hallmark's sales manager for the Northeast region, regarding

"explicit supervisory measures" to ensure card destruction therefore fails to support Dickens's argument that Northstar "owned" the Subject Cards.

In sum, the undisputed facts show that Hallmark passed the Subject Cards to Northstar so that Northstar could provide the service of destruction. See Little, Brown, and Co., 824 F. Supp. at 16–17 (determining that the recycler "had possession of the books as a bailee, it being '. . . universally agreed that a bailment for hire, or for mutual benefit, arises when a chattel is delivered by its owner to another for repairs, service, or alteration.'"). It is clear that there was no first sale here, where Hallmark only transferred the Subject Cards to Northstar subject to the clear restriction that it would recycle those cards and that Northstar could only use the paper pulp that resulted from that recycling. See Luxottica Grp. S.p.A.,160 F. Supp.2d at 552 (explaining that a manufacturer cannot prevent the resale of its branded product where it sold a branded product to a distributor "*without* restriction.") (emphasis added). Dickens has failed to set forth any evidence that would permit a reasonable fact-finder to determine that Hallmark sold the cards to Northstar instead of entrusting the cards to Northstar for destruction. Accordingly, there is no issue of fact as to whether there was a first sale of the subject cards by Hallmark. There was no such sale.[3]

III.    Hallmark's Motion

Hallmark seeks summary judgment on its claims for trademark infringement under 15 U.S.C. § 1114 and for trademark dilution under 15 U.S.C. § 1125. Hallmark alleges that Dickens

---

[3]  Hallmark also suggests that if Northstar wasn't required to recycle the cards under the express terms of the EA, Northstar was nonetheless contractually obligated to recycle due to "the parties['] long-standing course of dealing." Pl. Opp. at 13. In view of the Court's holding that Hallmark and Northstar were acting pursuant to the EA, it is unnecessary to discuss this alternative argument.

infringed and diluted the Hallmark trademark, and that Hallmark's claims are not foreclosed by Dickens's defense of the first sale doctrine. Hallmark has not moved with respect to its entire complaint. However, it states that if it prevails on the present motion, it will not pursue its other claims.

A. <u>Legal Principles</u>

1. <u>Trademark Infringement</u>.

The Lanham Act forbids the unauthorized third-party use of federally registered trademarks "in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). To prevail on a claim for trademark infringement a plaintiff "must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion." <u>Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC</u>, 823 F.3d 153, 160 (2d Cir. 2016) (quoting <u>Brennan's Inc. v. Brennan's Rest. L.L.C.</u>, 360 F.3d 125, 129 (2d Cir. 2004)).

Registered trademarks "are presumed to merit protection." <u>Slep-Tone Entm't Corp. v. Golf 600 Inc.</u>, 193 F. Supp. 3d 292, 297 (S.D.N.Y. 2016). To determine likelihood of confusion, courts in the Second Circuit apply the eight-factor balancing test introduced in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492 (2d Cir. 1961). Courts recognize the right of a trademark owner to protect the value of its mark by restricting, in certain cases, the sale of unauthorized goods. Caselaw developed under this theory recognizes that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." <u>El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.</u>, 806 F.2d 392, 395 (2d Cir. 1986). Such cases recognize that source confusion can

damage a trademark owner's good will in the trademarked goods. <u>By Design PLC v. BenElias</u>

<u>Industries Corp.</u>, No. 98 Civ. 4588 (LAP), 1998 WL 998964, at *3 (S.D.N.Y. July 15, 1998).

2.    <u>Trademark Dilution</u>

To succeed on a claim of trademark dilution a Plaintiff must show that an unauthorized

sale "is likely to cause dilution of [its] famous mark, regardless of the presence or absence of

actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

"Dilution by blurring" is statutorily defined as an "association arising from the similarity

between a mark or trade name and a famous mark that impairs the distinctiveness of the famous

mark." 15 U.S.C. § 1125(c)(2)(B). In determining whether a mark or trade name is likely to

cause dilution by blurring, the court may consider all relevant factors, including: (i) the degree of

similarity between the mark or trade name and the famous mark; (ii) the degree of inherent or

acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous

mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the

famous mark; (v) whether the user of the mark or trade name intended to create an association

with the famous mark; and (vi) any actual association between the mark or trade name and the

famous mark. 15 U.S.C. § 1125(c)(2)(B)(i–vi).

B.    <u>The Parties' Positions</u>

As to its claim of infringement, Hallmark alleges that Dickens's sale of the Cards is likely to

cause consumer confusion within the meaning of 15 U.S.C. §1141(1)(a).  As to its claim of

trademark dilution, alleged pursuant to 15 U.S.C. § 1125(c)(1), Hallmark alleges "blurring," of

its mark. It claims that the association of the Hallmark trademark with Dickens's sale of the

Cards impairs the distinctiveness of the Hallmark mark. <u>See</u> 15 U.S.C. §1125(c)(2)(B)(i)–(vi)

(setting forth factors to consider as to blurring).

Essentially, Hallmark argues that Dickens's proposed sale of outdated counter cards, which Hallmark specifically acted to remove from the market, will create consumer confusion as to source, damage Hallmark's mark, and therefore violate the Lanham Act. In opposition, Dickens argues that because the cards he seeks to distribute are actual Hallmark cards, they are "genuine," and their sale could therefore engender neither consumer confusion nor blurring of the Hallmark name. Plaintiff does not deny that the counter cards were Hallmark goods. However, it is argued that because they were neither current nor presented for sale in Hallmark-approved retail outlets, they are not genuine within the meaning of the Lanham Act. In fact, as found and held above, Hallmark did everything in its power to keep the counter cards out of the consumer market. It bailed them to Northstar so that they ultimately be recycled. As noted above, Hallmark was not required to police Northstar's adherence to the parties' agreement. It was entitled to rely on the good faith execution of its agreement with Northstar, and not have to assume that Northstar would breach its contractual obligations.

C.    Disposition of the Motion

Whether couched as a trademark violation by confusion or blurring, it is clear that Hallmark's claims are not neatly categorized or analyzed under the familiar infringement factors set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961). Hallmark's claims here fall squarely into the category of trademark law recognizing that infringement can occur even when allegedly infringing goods were manufactured by the holder of the mark. Such cases recognize that the sale of such good may nonetheless violate the Lanham Act. In El Greco, the Second Circuit reversed the District Court's denial of injunctive relief to a company that sought to prevent the sale of goods bearing its protected name. The goods at issue were manufactured by plaintiff, but had not passed an inspection process prior to being offered for sale

by defendant. Noting that the trademark owner had the right to require that its product passed inspection prior to being offered for sale, the Second Circuit rejected the generalized claim that because the goods were "genuine" there could be no claim of infringement. El Greco, 806 F.2d at 395. Importantly, the court focused on the fact that missing certificates of inspection were "an integral part of [El Greco's] effort at quality control." Therefore, the sale of uninspected goods constituted infringement even without a showing that the goods were somehow inferior. Id.; see By Design PLC v. BenElias Industries Corp., No. 98 Civ. 4588 (LAP), 1998 WL 998964, at *3 (S.D.N.Y. July 15, 1998) (granting preliminary injunctive relief where source confusion alleged could damage plaintiff's good will in the trademarked goods).

Defendant would have the Court limit El Greco to its facts, holding that the Lanham Act is violated only where the goods at issue were not up to the manufacturer's quality guidelines. The Court agrees that the "unauthorized sale" of trademarked goods, standing along, is insufficient to support a claim of infringement. H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc., 879 F.2d 1005, 1023 (2d Cir. 1989). However, the issue of the "genuine" nature of goods is nuanced, dependent upon a fact-based inquiry as to where "the line should be drawn" between infringement and permissible activity. Siemens, 879 F.2d at 1023. In Siemens, for example, it was held that the sale of trademarked goods could constitute infringement where the sale was likely to suggest that it was made as part of the trademark owner's organization of franchisees. Id.

Here, upon review of the undisputed facts set forth above, the Court holds that Dickens's sale of outdated counter cards to outlets outside of Hallmark's controlled and careful distribution network violated the Lanham Act. Such sales are a clear violation of the right of control, recognized in El Greco, as to the quality of goods, and protection of the good will associated

with the sale of goods. The Court realizes that greeting cards do not "expire" and that Hallmark did not require an "inspection" of counter cards prior to sale. However, these facts are not dispositive. Instead, the Court holds that the right to inspect products before they are sold is closely analogous to a trademark owner's right to control the value of its brand in the distribution network. Hallmark takes extensive steps to protect the sale of its in-season counter cards. Indeed, it takes steps to ensure that outdated cards do not flood the market by contracting to have them destroyed.

Additionally, Hallmark sells counter cards only to Hallmark approved retailers, including its Gold Crown stores. There is no dispute that Hallmark closely guards the type of stores that it will allow to carry its current counter cards, approving sales only in retail outlets projecting the proper environment. This closely guarded chain of distribution was violated by Dickens's admitted sale to stores that sell pornography, which stores are undoubtedly not the environment in which Hallmark chooses to market its current merchandise.

All of the steps taken by Hallmark to market its current counter cards were undertaken to protect the good will and value of the Hallmark brand. If Hallmark wanted to be known as a discounter of past-season cards, it could easily have entered that market. It did not. The law as set forth in El Greco allows Hallmark, as a trademark owner, to protect its brand. Allowing Dickens to violate that right by claiming that it sells a "genuine" product outside of Hallmark's carefully protected chain of distribution violates the Lanham Act. Accordingly, Hallmark's motion for summary judgment is granted.

<u>CONCLUSION</u>

For the foregoing reasons, this Court respectfully recommends that Hallmark's motion be granted, and that Dickens's motion be denied.

<u>OBJECTIONS</u>

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. <u>Thomas v. Arn</u>, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); <u>Caidor v. Onondaga Cnty.</u>, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

**SO ORDERED.**

Dated:  Central Islip, New York
        February 28, 2020

                                                  /s/ Anne Y. Shields
                                                 Anne Y. Shields
                                                 United States Magistrate Judge