UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
HALLMARK LICENSING, LLC and
HALLMARK MARKETING COMPANY, LLC,

                Plaintiffs,           Case No. 17-cv-2149 (SJF)(AYS)

     -against-              <u>MEMORANDUM AND ORDER</u>
                                  Adopting Report and Recommendation

DICKENS, INC.,
                  Defendant.
----------------------------------------------------------X
FEUERSTEIN, District Judge:

I.    <u>Introduction</u>

       Presently before the Court is the February 28, 2020 Report and Recommendation of

Magistrate Judge Anne Y. Shields (*see* ECF No. 138;1 hereafter, "Report" or "R&R"2):

       *A.  Recommending* that: (1) the motion for partial summary judgment of Plaintiffs

Hallmark Licensing, LLC and Hallmark Marketing Company, LLCs (hereafter, "Plaintiffs",

"Hallmark" or "Company") (*see* ECF No. 92; hereafter, the "HM Motion"), which seeks

judgment in their favor regarding their claims of trademark infringement (Count I) and

trademark dilution (Count II) pursuant to the Lanham Act, 15 U. S.C. § 1114 & § 1125,

respectively, be granted; and (2) the summary judgment motion of Defendant Dickens, Inc.

(hereafter "Dickens") (*see* ECF No. 114; hereafter, the "Dickens Motion"), which seeks

---

1  *See also Hallmark Licensing, LLC v. Dickens, Inc.*, No. 17-cv-2149, 2020 WL 1914762,
report & recommendation (E.D.N.Y. Feb. 28, 2020).  Page citations to the Report shall be to
those found in the docketed version of the Report, *i.e.*, ECF No. 138.

2  The Court presumes the parties' familiarity with the terms of art defined in the Report, which
are incorporated herein.

judgment in its favor on all count of Hallmarks' Complaint, which, in addition to trademark infringement and dilution claims, also includes a claim of unfair competition pursuant to the Lanham Act (Count III) and a claim of deceptive trade practices pursuant to New York state law (Count IV), be denied; and

    *B. Advising, inter alia,* that: (1) "[a]ny written objections to th[e] Report . . . must be filed with the Clerk of the Court within fourteen (14) days of filing of th[e R]eport"; and (2) a "[f]ailure to file objections within fourteen (14) days will preclude further review of th[e R]eport . . . either by the District Court or Court of Appeals." (Report at 22 (citing 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b); *Thomas v. Arn*, 474 U.S. 140, 145 (1985); *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008)).)

    There is no dispute that: the parties' respective Motions focused upon two issues, *i.e.*, whether the transaction between Hallmark and Northstar constituted a "first sale" under federal trademark law, and assuming, *arguendo*, such a sale, whether the Subject Cards are considered "genuine" under applicable law, thereby permitting Dickens' sale of said Cards (*see, e.g.*, Dickens Support Memo (ECF No. 115) and HM Opp'n (ECF No. 117); HM Support Memo (ECF No. 102) and Dickens Opp'n (ECF No. 107)); and, in making her recommendations, Magistrate Judge Shields addressed both those issues (*see* Report at 11-16 (addressing Dickens' claim of a "first sale" defense), 16-21 (addressing Hallmark's claims of trademark infringement and dilution)). Dickens objects to the Report (hereafter, "Objection") (*see* ECF No. 140), claiming the Magistrate Judge's "finding that Hallmark's transfer of the [S]ubject [C]ards to Northstar for destruction was not a 'first sale' under trademark law" and her determinations that Dickens sold the Subject Cards without Hallmark's permission, which Cards were not "genuine"

because they were outdated and sold to stores not approved by Hallmark, thereby entitling Hallmark to summary judgment "are erroneous as a matter of fact, logic and law, because they ignore record evidence, decide disputed facts in Hallmark's favor, misstate controlling legal principles and stretch existing case law and statutory interpretation well beyond the break-point." (*Id.* at 2.)   In response, Hallmark contends the Magistrate Judge "correctly applied [the] two-part analysis under the first sale doctrine when granting Hallmark's Motion and denying Dickens' Motion," since she found that, under the undisputed record, Hallmark had not authorized the first sale of the Subject Cards to Northstar and, even if it had, the goods were not genuine as "'they were . . . not in accord with the trademark owner's quality standards.'" (Response (ECF No. 142) at 5 (quoting R&R at 12, 13-16, 19-21).)   As such, Hallmark contends "Dickens' objections to each of these conclusions are unfounded and should be overruled."   (*Id.*)   The Court agrees and, for the reasons that follow, overrules Dickens' objections and adopts Magistrate Judge Shields' Report in its entirety.

II.  Background

      Dickens has not raised specific objections to the Magistrate Judge's recitation of the factual background which gives rise to this action, and which this Court finds to be thorough and accurate.   Therefore, the "FACTUAL BACKGROUND" is adopted in its entirety and incorporated herein.   For the reader's convenience, the Court briefly summarizes the relevant background that precipitated this litigation.

      "Hallmark is the top selling card manufacturer in the United States . . . creat[ing] and distribut[ing] greeting cards . . . under its well-known and famous Hallmark trademark" (Report at 2), which is federally registered.   (*See id.* at 3.)   Upon the closure of its distribution facility in

Enfield, Connecticut in 2015, and pursuant to its Enterprise Agreement with NorthStar, Hallmark delivered seventy-three trailers of counter greeting cards and related paper products to Northstar for destruction by means of converting the products to paper pulp, which Hallmark and Northstar referred to as "recycling." However, rather than recycling those cards and products as Hallmark and Northstar contractually agreed, NorthStar sold them to another entity, Square Peg, in 2016, which, in turn, sold twenty of the seventy-three trailers to Defendant in 2017, *i.e.*, the Subject Cards. Dickens took possession of three of the trailers and, in March 2017, began selling Subject Cards to others for resale to the public. Upon learning of this, on March 30, 2017, Hallmark sent Dickens a cease and desist letter. When Dickens refused to comply with Hallmark's demand, Hallmark commenced this action on April 10, 2017.[3] That same day, at the preliminary injunction hearing, the parties agreed to stipulated restraints which, among other things, precludes Dickens from selling or offering to sell the Subject Cards it possesses. (*See* ECF No. 7; Report at 9.[4])

III. Discussion

    A. *Applicable Standards*

        1. The Report and Recommendation Standard of Review

    Rule 72 of the Federal Rules of Civil Procedure permits a magistrate judge to conduct proceedings of dispositive pretrial matters without the consent of the parties. *See* Fed. R. Civ. P.

---

3 This case was originally assigned to the Honorable Leonard D. Wexler. It was reassigned to the undersigned on April 4, 2018. (*See* Case Docket, April 4, 2018 docket entry.)

4 "In a separate action filed by Hallmark against Square Peg [the entity that purchased the Subject Cards from Northstar], Square Peg agreed to transfer all of the Hallmark branded greeting cards in its possession to Northstar to be destroyed under Hallmark's supervision." (Report at 9-10.)

72(b).   Any portion of a report and recommendation on dispositive matters to which a timely objection has been made is reviewed *de novo*.   *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). However, "when a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error."   *Frankel v. City of N.Y.*, Nos. 06-cv-5450, 07-cv-3436, 2009 WL 465645, at *2 (S.D.N.Y. Feb. 25, 2009) ("Similarly, 'objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke *de novo* review.'" (quoting *Vega v. Artuz,* No. 97-cv-3775, 2002 WL 31174466, at *1 (S.D.N.Y. Sept.30, 2002))); *see also Butto v. Collecto, Inc.*, 290 F.R.D. 372, 379 (E.D.N.Y. 2013) ("In a case where a party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." (quotations and citation omitted)).   The Court is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are made.   *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *see generally Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F. Supp.2d 186, 189 (E.D.N.Y. 2011) (finding, where no objections have been made, "the district court need only satisfy itself that there is no clear error on the face of the record").   "[A] court may in its sound discretion, afford a degree of deference to the magistrate's Report and Recommendation."   *VOX Amplification Ltd. v. Meussdorffer*, 50 F. Supp.3d 355, 369-70 (E.D.N.Y. 2014)(citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980)).   Moreover, whether or not proper objections have been filed, after review, the district judge may accept, reject, or modify any of the magistrate judge's findings or recommendations.   *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2.  <u>Trademark Infringement</u>

The Lanham Act forbids the unauthorized third-party use of a federally registered trademark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."   15 U.S.C. § 1114(1)(a); *see also Warner-Lambert*, 86 F.3d at 6 ("An action for trademark infringement arises where '[a]ny person . . . without the consent of the registrant . . . use[s] in commerce any . . . registered mark in connection with the sale . . . of any goods . . . [and] such use is likely to cause confusion . . . .' "   (quoting 15 U.S.C. § 1114(1)(a))). "[R]egistration of a federal mark confers upon the owner of the mark a presumption that the owner has the exclusive right to use the mark nationwide . . . ."   *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 266 (2d Cir. 2011); *see also Slep-Tone Entm't Corp. v. Golf 600 Inc.*, 193 F. Supp.3d 292, 297 (S.D.N.Y. 2016) (stating registered trademarks "are presumed to merit protection").   Further, "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."   *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009)(quoting *El Greco*).   Source confusion can damage a trademark holder's good will in the trademarked goods.   *See By Design PLC v. BenElias Industr. Corp.*, No. 98-cv-4588, 1998 WL 998964, at *3 (S.D.N.Y. July 15, 1998).

To prevail on its claim for trademark infringement, the trademark holder "must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion."   *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec.*

*Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (quoting *Brennan's, Inc. v. Brennan's Rest.,*

*L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004)); *see also VOX Amplification*, 50 F. Supp.3d at 365.

> With respect to determining whether the use of a mark by an allegedly infringing party will cause confusion,
>
>> [c]ourts look to the following factors . . . : (1) the strength of the [party's] mark; (2) the similarity of the marks; (3) the competitive proximity of the products in the marketplace; (4) the likelihood that the senior user will "bridge the gap" by moving into the junior's product market; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market.
>
>> [*Juicy Couture v. Bella Intern. Ltd.,* 930 F. Supp.2d, 489, 499 (S.D.N.Y. 2013)] (citing *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961)). These factors are referred to by courts as the "*Polaroid* factors," based on the Second Circuit case *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d at 495, from which they derive.

*VOX Amplification*, 50 F.Supp.3d at 365–66. The *Polaroid* factors are usually applied in the

context of counterfeit goods. *See Alcon Vision, LLC v. Lens.Com, Inc.*, No. 18-cv-407, 2020

WL 5899879, at *14 (E.D.N.Y. Feb. 28, 2020)(emphasis added), *report & recommendation*

*adopted by* 2020 WL 3989492 (E.D.N.Y. July 15, 2020) ("To prevail on a Lanham Act claim for

infringement, a plaintiff must show a likelihood of consumer confusion, which, in the case of

counterfeit goods, is typically measured by the so-called *Polaroid* factors.").

### 3. Trademark Dilution

> The concept of trademark dilution has been described as a "subtle" one, *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp.2d 463, 521-22 (S.D.N.Y. 2008), *aff'd in part, reversed in part on other grounds*, [600 F.3d 93 (2d Cir. 2010),] and calls for some

explanation. "When an individual encounters a mark (*e.g.*, a word or symbol) in a store or watching a commercial, he or she can develop an association between a product or service and its corresponding quality, brand reputation, or origin." 1A Lindey on Entertainment, Publishing and the Arts § 2:52.50 (3d ed., updated Jan. 2016). Anti-dilution laws protect those acquired associations from being diluted by other uses of a plaintiff's trademark. In particular, dilution by blurring . . . refers to the gradual diminishment of a famous mark's acquired "ability . . . to clearly and unmistakably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (alteration in original) (internal quotation marks omitted) . . . . In other words, "dilution occurs when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular." H.R. Rep. No. 109-23, at 4 (2005), *as reprinted in* 2006 U.S.C.C.A.N. 1091, 1092.

*Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp.3d 425, 432-33 (S.D.N.Y. 2016)(internal footnote omitted). Specifically, "dilution by blurring" is defined as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). To establish a trademark dilution claim, a trademark holder must show that the unauthorized sale of its mark "is likely to cause dilution of [its] famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

> In determining whether a mark or trade name is likely to cause dilution by blurring, *the court may consider all relevant factors*, including the following:
>
>> (i) The degree of similarity between the mark or trade name and the famous.
>> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
>> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
>> (iv) The degree of recognition of the famous mark.

> (v)   Whether the user of the mark or trade name
> intended to create an association with the famous.
> (vi)   Any actual association between the mark or
> trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B)(i-vi) (emphasis added); *see also George Nelson Found. v. Modernica,*

*Inc.*, 12 F. Supp.3d 635, 649-50 (S.D.N.Y. 2014).

### 4.   The "First Sale" Doctrine

> "As a general rule, trademark law does not reach the sale of
> genuine goods bearing a true mark even though the sale is not
> authorized by the mark owner." *Polymer Tech. Corp. v. Mimran*,
> 975 F.2d 58, 61 (2d Cir. 1992); *accord Zino Davidoff*, 571 F.3d at
> 243.   This general rule flows from the principle that the right of a
> manufacturer to control distribution of its products does not extend
> beyond the first sale of the product, *as long as the product sold is
> genuine.   See Abbott Labs. v. Adelphia Supply USA*, 15-CV-5826
> (CBA) (LB), 2019 WL 5696148, at *4-5 (E.D.N.Y. Sept. 30,
> 2019); *Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp.2d
> 208, 222-23 (S.D.N.Y. 2011).

*Alcon Vision, LLC v. Lens.Com, Inc.*, No. 18-cv-407, 2020 WL 5899879, at *14 (E.D.N.Y. Feb.

28, 2020)(emphasis added), *report & recommendation adopted by* 2020 WL 3989492 (E.D.N.Y.

July 15, 2020).

Where a party seeks to invoke the "first sale" doctrine as a defense to a claim of

trademark infringement, two components must be satisfied.   The party must initially show that

the trademark holder authorized the first sale of the trademarked goods into the stream or

channels of commerce.   *See, e.g., Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp.2d 369, 382-

383 (S.D.N.Y. 2000); *see also Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F. Supp.

224, 230 (S.D.N.Y. 1997) (same).   If the trademark holder did not authorize such a first sale,

then "the goods cannot be considered genuine as a matter of law *and infringement is

established*." *Id.* at 382 (emphasis added); *Liz Claiborne, Inc.*, 979 F. Supp. at 230 ("The

question of whether a good is genuine, however, presupposes the initial sale was authorized."), and at 231 ("If the first sale . . . was not authorized, then the [goods] cannot be genuine for infringement purposes."). However, if the party invoking the doctrine as a defense establishes the threshold showing that the first sale was authorized, it must then show that "the goods which were later resold without authorization were genuine." *Ryan*, 107 F. Supp. 2d at 382. Where the goods at issue are found to be genuine, there is no violation of the Lanham Act, despite the subject goods having been resold without the trademark holder's consent. Among other showings, the Second Circuit has "held that goods are not genuine if . . . they do not conform to the trademark holder's quality control standards." *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009)(citing *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 78 (2d Cir.1994)). "That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark." *Id.* Thus, "[i]f the goods were . . . *not in keeping with the trademark owner's quality standards*, a valid claim for trademark infringement is established." *Ryan*, 107 F. Supp. 2d at 382 (emphasis added).

  B. *The Instant Case*

    1. <u>The Magistrate Judge's Report</u>

     (*a.*) *Dickens' Summary Judgment Motion*

  The Magistrate Judge rejected Dickens' invocation of the first sale doctrine as a defense to all of Hallmark's causes of action because "[t]he undisputed facts show that . . . Hallmark transferred the Subject Card to Northstar with the restriction that Northstar destroy the card stock through recycling." (Report at 13 ("[T]he transaction is akin to a bailment, rather than a sale."

(quoting *Little Brown and Co., Inc. v. Am. Paper Recycling Corp.*, 824 F. Supp. 11, 15 (D. Mass. 1993)); *see also id.* at 14 ("The undisputed facts show that Hallmark provided the [Subject C]ards to Northstar so that Northstar would destroy the cards. The Enterprise Agreement and the parties' course of conduct reflected a relationship by which Northstar provided recycling services to Hallmark."). After a thorough discussion of the record evidence (*see id.* at 13-16), the Magistrate Judge found "that there was no first sale here, where Hallmark only transferred the Subject Cards to Northstar subject to the clear restriction that it would recycle those cards and that Northstar could only use the paper pulp that resulted from that recycling." (*Id.* at 16.) Because Dickens "failed to set forth any evidence that would permit a reasonable fact-finder to determine that Hallmark sold the [Subject C]ards to Northstar instead of entrusting th[os C]ards to Northstar for destruction" (*id.*), the Magistrate Judge recommended that Dickens' Motion be denied. (*See id.* at 21.)

(*b.*) *Hallmark's Summary Judgment Motion*

Recognizing that Hallmark moved for summary judgment in its favor for trademark violations due to infringement caused by confusion and due to "dilution by blurring," the Magistrate Judge also recognized these "claims are not neatly categorized or analyzed under the familiar [*Polaroid*] infringement factors," but, instead, "fall squarely into the category of trademark law recognizing that infringement can occur even when allegedly infringing goods were manufactured by the holder of the mark." (Report at 19 (discussing *El Greco*, 806 F.2d at 395).) More particularly, Magistrate Judge Shields focused upon a line of cases finding that where a trademark holder's well-established quality control efforts are ignored, infringement can occur "even without a showing that the goods were somehow inferior" (*id.* at 20 (citing *El*

*Greco*, 806 F.2d at 395; *By Design*, 1998 WL 998964, at *3)), as well as Second Circuit precedent finding that "the sale of trademarked goods could constitute infringement where the sale was likely to suggest that it was made as part of the trademark owner's organization of franchisees." (*Id.* (noting that determining whether goods are "genuine" within the trademark context is a "fact-based inquiry" (citing *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1023 (2d Cir. 1989))).)

Upon the undisputed facts, the Magistrate Judge found that "Hallmark takes extensive steps to protect the sale of its in-season counter [greeting] card" and "to ensure that outdated cards [(*e.g.*, the Subject Cards)] do not flood the market by contracting to have them destroyed" and that this "right to control the value of its brand in the distribution network" is "closely analogous" to "the right to inspect products before they are sold." (Report at 21.) Therefore, "Dickens's sale of outdated counter cards[, *i.e.*, the Subject Cards,] to outlets outside of Hallmark's controlled and careful distribution network violated the Lanham Act." (*Id.* at 20 ("Such sales are a clear violation of the right to control, recognized in *El Greco*, as to the quality of goods, and protection of the good will associated with the sale of goods."); *see also id.* at 21 ("The law as set forth in *El Greco* allows Hallmark, as a trademark owner, to protect its brand. Allowing Dickens to violate that right by claiming that it sells a 'genuine' product outside of Hallmark's carefully protected chain of distribution violates the Lanham Act.").)

### 2. Consideration of Dickens' Objections

Having reviewed the parties' underlying summary judgment motion papers, it is apparent that Dickens' objections to the Report are no more than reiterations of its original arguments, which is insufficient to invoke *de novo* review. *See Frankel*, 2009 WL 465645, at *2.

Therefore, the Court reviews the Report for clear error.   *See Butto*, 290 F.R.D. at 379.

(*a.*)   *Re: The Magistrate Judge's conclusion that there was no first sale*

Dickens would have this Court find error with the Magistrate Judge's Report because: the Enterprise Agreement "explicitly provides that Northstar would 'purchase commodities' – i.e., cards and other products – from Hallmark" and never mentions the term "bailment" (Objection at 4); Northstar's Treasurer, Aaron Goodman, testified that Northstar purchased products from Hallmark (*see id.* at 5 (quoting Goodman Depo. Tr., 94:1-13 (testifying to paying Hallmark "$10 a ton" for the "products"))); the Magistrate Judge allegedly disregarded "buy/sell" documents "provided to Hallmark to document what Northstar owed Hallmark for Northstar's purchases of its card stock and other commodities, based on tonnage" (*id.* at 8); and, the Magistrate Judge "fail[ed] to acknowledge any of [Dickens'] cited cases holding that a transfer for salvage *can be* a first sale under trademark and copyright law" but concluding that the transaction between Hallmark and Northstar was a bailment.   (*Id.* at 10 (emphasis added).)

On the record presented, Dickens' objections are without merit.   First, Magistrate Judge Shields analogy to a bailor/bailee relationship in examining the Enterprise Agreement and the course of conduct between Hallmark and Norhtsar, leading to her finding that the transfer of the Subject Cards from Hallmark to Northstar was "not a sale within the meaning of the first sale doctrine" is borne out by the record evidence.   (Report at 14 (highlighting the "undisputed facts" that show "Hallmark provided the cards to Northstar so that Northstar would destroy the cards"). Second, notwithstanding Dickens' reliance on selective citations to Goodman's deposition testimony regarding purchasing product from Hallmark by the ton (*see* Objection at 5 (quoting Goodman Depo. Tr. 94:1-13)) to establish a qualifying first sale and its implication that the

˅13˅

Magistrate Judge did not give "buy/sell" documents proper consideration in making her findings regarding Dickens' reliance on the "first sale" doctrine as a defense, review of the Report in conjunction with *de novo* review of the record evidence lends little support to these objections. Review of the Enterprise Agreement makes clear that Hallmark and Northstar agreed to engage in an extended symbiotic, commercial relationship with Hallmark buying a service, *i.e.*, destruction by recycling, and selling a commodity, *i.e.*, paper stock, and visa-versa for Northstar.5   As Magistrate Judge Shields found, the transfer of goods from Hallmark to Northstar was never with the intention of placing trademark-protected greeting cards (and other trademark-protected products) into the stream of commerce for consumer consumption, *i.e.*, selling greeting cards in a manner that would exploit for profit the Hallmark trademark, but, instead, was always transferred with the intention of preserving the value of the Hallmark trademark by limiting the availability of its trademark-protected greeting cards (and other trademark-protected products), *i.e.*, eliminating those goods from the stream of commerce by having them destroyed when Hallmark determined it no longer wished to make them available. As noted, Hallmark and Northstar referred to this transfer for destruction as "recycling" which was accomplished by Northstar converting Hallmark products into paper pulp.   (*See, e.g.,* Goodman Decl. (ECF No. 100) ¶¶1, 3, 4, 7, 9, 11, 12 (declaring, *inter alia*: "Northstar is a recycler.   It is not in the business of selling greeting cards;" "Northstar recycles various

---

5   Of note, in its Support Memorandum, Dickens asserts that "the Enterprise Agreement is a service contract that requires Hallmark to pay Northstar in consideration of Northstar's 'recycling' services with respect to Hallmark products," in arguing that Northstar's acquisition of the Subject Cards was a purchase, but not pursuant to the Enterprise Agreement.   (*See* ECF No. 115 at 14.)

materials including paper products for use as raw materials in other finished products;" Northstar entered into the Enterprise Agreement with Hallmark to destroy by recycling "*all* Hallmark products including cards or card stock" from Hallmark's Enfield distribution center (emphasis added); "Without Hallmark's knowledge, *rather than destroy* [*the Subject Cards*] *through recycling <u>as was required by the Agreement</u>, Northstar sold them* to three individuals . . ." (emphases added); Northstar did not reflect this sale on its books and sold the Subject Cards, "charg[ing] a bulk rate and not on a per card basis, which rate was well below the actual value of the cards."); *see also* Vangsness Decl. (ECF No. 98 at 1-2), ¶3 (Hallmark's Strategic Buyer declaring, *inter alia*: "NS destroyed greeting cards for Hallmark.   This was a critical aspect of the Enterprise Agreement.   It was understood that *recycling included a destructive process that would preclude the sale of discarded greeting cards as greeting cards*." (emphasis added)). Equally significant to the Magistrate Judge's finding that there was no qualified "first sale" is the abundant evidence that Hallmark and Northstar considered Hallmark's sale of goods to Northstar to be the sale of commodities, *i.e.*, a paper source, for Northstar's conversion of that commodity to another product, *i.e.*, paper pulp, and not the sale of trademark-protected retail items, *i.e.*, greeting cards as greeting cards (*see, e.g.,* Enterprise Agreement (ECF No. 98), § 4.5 ("Supplier [*i.e.*, Northstar] agrees to purchase *commodities* and sell services to Company [*i.e.*, Harkmark] as listed on Exhibit A for the prices reflected thereon." (emphasis added)); *see also* Ex. A (entitled, "Specifications, Products, Services and Prices"), attached to Enterprise Agreement (ECF No. 98 at 21) (referring to the "Official Board Market[s]" publication6  as the agreed source for monthly

6  *See, e.g.*, https://www.risiinfo.com/press-release/official-board-markets-merging-into-risis-ppi-pulp-paper-week/ (accessed Oct. 5, 2020) (stating, in an October 5, 2012 press release, that

tonnage pricing for the paper products Hallmark sold to Northstar; providing a pricing table for different types of paper products; stating, *inter alia*, "Northstar agrees that *all material from Hallmark* will not be sent to the landfill. *If Northstar is unable to sell the commodities for recycling, they agree to notify Hallmark for joint disposition*." (emphases added)). Ironically, Dickens own objection acknowledges this fact. (*See* Objection at 8 ("The [shipping statement] documents, as well as others, were provided to Hallmark to document what Northstar owed Hallmark *for Northstar's purchases of its card stock and other commodities, based on tonnage*." (emphasis added)).) The record evidence: buttresses Hallmark's position that "[t]here was no qualifying 'first sale' of trademarked goods 'into the stream of commerce' by Hallmark, which is explicitly required under the Lanham Act[,] . . . . . [when] Hallmark entrusted the obsolete/discarded greeting cards to Northstar for destruction and not for the purpose of placing the [Subject C]ards into the stream of commerce" (HM Support Memo (ECF No. 102) at 7); supports the Magistrate Judge's finding that Dickens cannot shield itself from liability by invoking a "first sale" doctrine as a defense; and warrants overruling Dickens' objections.

To the extent Dickens would fault Magistrate Judge Shields for not discussing all the cases it cites in support of its position that there are cases which hold "a transfer for recycling, at salvage prices, *may* be a 'first sale' under trademark and copyright law" (Report at 9 (emphasis added); *see also id.* at 8), its contention is unavailing. "[C]ourts are not required to assess each

_____

"RISI, the leading information provider for the global forest products industry, . . . has incorporated the publication *Official Board Markets* (OBM) into its sister publication, *PPI Pulp & Paper Week* (PPW). As the premier news and price reporting service for the North American pulp and paper industry, PPW will leverage the addition of OBM resources and content to improve the accuracy of recovered paper price reporting and expand its coverage of the paperboard market.").

argument in detail.   Indeed, 'there is no requirement for a court to specifically address each and every argument raised by a party in papers filed with the Court.'"   *Miller v. Metro. Life Ins. Co.*, No. 17-cv-7284, 2018 WL 5993477, at *5 n.5 (S.D.N.Y. Nov. 15, 2018) (quoting *Driessen v. Royal Bank Int'l*, No. 14-cv-1300, 2015 WL 881205, at *2 (D. Conn. Mar. 2, 2015) (citing *Jackson v. Fed. Exp.*, 766 F.3d 189, 199 (2d Cir. 2014) ("[A] district court is not required to 'write an opinion or lengthy order in every case[.]'" (citation omitted)))) (adopting report and recommendation where the magistrate judge "applied the correct law and adequately explained her reasoning").   By extension, neither is a court required to address each and every case cited by a party in support of its position.   Moreover, this objection merely reiterates an argument Dickens expounded in its reply brief to Hallmark's opposition to the Dickens Motion (*see* Objection at 8, n.4 (citing Dickens Reply (ECF No. 128) at 5)), which is subject to review for clear error.   *See, e.g., Chiari v. N.Y. Racing Assoc., Inc.*, 972 F. Supp.2d 346, 351 (E.D.N.Y. 2013).   No such error is found; Magistrate Judge Shields applied the correct law and adequately explained the reasoning for her finding that, upon the record evidence in this instance, no "first sale" occurred between Hallmark and Northstar.   Therefore, this portion of Dickens' objection is also overruled.

> (b.)   *Re: The Magistrate Judge's conclusion that the Subject Cards are not "genuine"*

The essence of Dickens' objection regarding the Magistrate Judge's conclusion that the Subject Cards are not "genuine" is that she erred in relying upon the Second Circuit *El Greco* case in finding "'Dickens's sale of outdated counter cards to outlets outside of Hallmark's controlled and careful distribution network violated the Lanham Act.'"   (Objection at 13

(quoting Report at 20-21 (Report further stating: "Such sales are a clear violation of the right to control, recognized in *El Greco*, as to the quality of goods, and protection of the good will associated with the sale of goods. . . . [Hallmark's] closely guarded chain of distribution was violated by Dickens's admitted sale to stores that sell pornography, which stores are undoubtedly not the environment in which Hallmark chooses to market its current merchandise.")).) It argues that: "obsolescence and sale of the [S]ubject [C]ards to stores that would not be approved by Hallmark [] are not at all of the sort that courts have recognized to support a trademark claim stemming from the sale of the mark holder's unaltered products" (*id.* (citing *Siemens Medical*, 879 F.2d at 1023)); the Subject Cards "unquestionably were Hallmark-approved cards, since Hallmark had previously sold the exact same style of Hallmark cards to its retail outlets that Dickens had purchased from Square Peg" (*id.* at 14); and, "the specific circumstances cited in the R&R as supposedly establishing a trademark violation do not come within the narrow exceptions to the established rule that sales of the mark holder's authentic products do not violate trademark law." (*Id.*; *see also id.* at 16-17.) More specifically, Dickens contends the Magistrate Judge erred in finding the Subject Cards were outdated thereby rendering them not genuine, claiming incompetent evidence to support that finding (*see id.* at 17-20), and in finding Hallmark closely controls the types of stores where it permits its current counter cards to be carried, questioning that assertion given Hallmark's alleged looser controls over the sale of boxed cards and other trademark protected products and its alleged sale of certain counter cards to discount stores (*see id.* at 21).

Responding to Dickens' objections, Hallmark asserts, *inter alia*: "because Judge Shields found there was no authorized first sale, . . . the HALLMARK Branded Greeting Cards are not

genuine as a matter of law" (Response at 12 (citing Report at 12; *Ryan*, 107 F. Supp.2d at 382 ("If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established"); Dickens' Support Memo (ECF No. 115) at 10 (quoting *Ryan*))); Magistrate Judge Shields properly applied *El Greco* and *Siemens* to the facts of this case, contrary to Dickens' reiteration of its original arguments incorporating those cases (*see id.* at 13-15); and, Dickens has not presented any triable issues of fact, nor can it create any, warranting denial of summary judgment in Hallmark's favor (*see id.* at 15-16).

It was not necessary for the Magistrate Judge to consider the "genuine" prong of the "first sale" analysis in this instance because having found there was no authorized first sale of the Subject Cards from Hallmark to Northstar, the Subject Cards "cannot be considered genuine as a matter of law and infringement is established." *Ryan*, 107 F. Supp.2d at 382; *see also Liz Clairborne*, 979 F. Supp. at 231 ("If the first sale [] was not authorized, then the [goods] cannot be genuine for infringement purposes."). On that basis alone, Dickens' objections are futile. Even if that were not so, however, the Court would find Dickens' objections unavailing. For example, there is no merit to Dickens' claim that in making her genuineness finding, the Magistrate Judge erred by relying upon incompetent evidence, *i.e.*, the declaration of Kim Fain, a Senior Demand and Inventory Planner at Hallmark (*see* ECF No. 95), as a careful review of the Report reveals there is no reference to it. Further, because it is the Subject Cards and not Hallmark's "branded boxed cards and other products" that are at issue, it is irrelevant that Hallmark supposedly applies a less stringent distribution control standard to those other items. Nor, other than Chou's self-serving testimony, is there any evidence that "Hallmark has already blatantly devalued its own brand by selling Hallmark brand counter cards at deep discounts."

(Objection at 21.)

Moreover, Magistrate Judge Shields' nuanced analysis of the record evidence, pursuant to *El Greco*, supports her finding: that Hallmark employed careful controls over its products, which controls were "undertaken to protect the good will and value of the Hallmark brand" (Report at 21 (discussing Hallmark's closely guarded chain of distribution of cards); *cf., id.* at 15 (highlighting evidence of Hallmark's monitoring the destruction of cards to control its trademark)); that "[t]he law as set forth in *El Greco* allows Hallmark, as a trademark owner, to protect its brand" (*id.*); and that "[a]llowing Dickens to violate that right by claiming that it sells a 'genuine' product outside of Hallmark's carefully protected chain of distribution violates the Lanham Act." (*Id.*) Indeed, email communication from Dickens' owner, James Chou, substantiates Dickens' understanding that flooding the market with the Subject Cards would be damaging to Hallmark's brand and that eliminating trademarked product from the market is a means of protecting a brand. (*See* Ex. P (ECF No. 93-16), submitted in support of HM Motion (email from James Chou, Dickens Owner, to Julie Erickson, Am. Greetings, regarding availability of the Subject Cards (Mar. 24, 2017), stating, *inter alia*: "With such a huge volume of Hallmark cards dumping in the market, I believe the market will be in a turmoil and the Hallmark brand will be seriously damages," and "We have bought many [American Greeting]/Gibson cards which we could not sell, but instead of discounting or dumping into the market, we just threw them away in the dumpster.").) Hence, upon the record presented, no error lies in the Magistrate Judge's finding that the Subject Cards were not genuine.

### 3. Hallmark's Dilution Claim

To the extent not explicitly addressed in the Report, the Court finds that there are no material disputed facts regarding Hallmark's dilution claim which would preclude granting it summary judgment on said claim. Dickens has stipulated "that the Hallmark mark is a 'famous' mark as required under 15 U.S.C. § 1125(c)." (So Ordered Stipulation (ECF No. 85), ¶3.) Moreover, since there is no dispute that Subject Cards sold by Dickens were actual Hallmark trademarked greeting cards, the presumption of actual dilution of the Hallmark trademark inures to Hallmark. *See. e.g.*, *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 452 (2d Cir. 2004)("[W]here a plaintiff who owns a *famous* senior mark can show the commercial use of an identical junior mark, such a showing constitutes circumstantial evidence of the actual-dilution element of a[ trademark dilution] claim." (emphasis in original)); *see generally id.* at 453 & n.10 (noting that "commentators have suggested . . . that an identity of marks creates a presumption of actual dilution"). (*Cf.,* Ex. N (ECF No. 93-14), submitted in support of HM Motion, at Response No. 50 (admitting that Dickens sold Hallmark brand products it obtained from Square Peg which contained the Hallmark trademark), and Response No. 51 (stating "Hallmark implicitly authorized Dickens to sell Hallmark Brand cards obtained from Square Peg by having engaged in a First Sale to Northstar . . . .").) Dickens has failed to overcome this presumption. (*See, e.g.,* Ex. E (ECF No. 93-5), submitted in support of HM Motion, at 468:21-24 (Chou testifying to knowing that selling the Subject Cards "at a huge discount could seriously damage the Hallmark brand").) Therefore, having put forth sufficient undisputed evidence that Dickens' sale of Subject Cards is likely to cause dilution to its famous trademark, *see* 15 U.S.C. § 1125(c)(1), Hallmark has established that, as a matter of law, it is entitled to summary judgment in its favor

on its dilution claim.

Even if that were not so, while Hallmark pursued this claim, arguing that the record evidence establishes its claim of trademark dilution (*see* HM Support Memo (ECF No. 102) at 29-30), Dickens failed to address it in any meaningful fashion.   (Dickens Opposition (ECF No. 107), *in toto*; *see also* Dickens Support Memo (ECF No. 115), Argument, Part G (other than a cursory reliance upon the first sale doctrine, failing to develop any argument supporting summary judgment in its favor on Hallmark's § 1126(c) dilution claim).)   Thus, the Court agrees with Hallmark's contention that, "aside from its first sale defense, Dickens has abandoned all other defenses to this claim, effectively conceding that all of the elements of Hallmark's dilution claim have been satisfied."   (Response at 13 (citing *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.")); further citations omitted).)   *See also Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016)("Even where abandonment by a counseled party is not explicit, a court may infer abandonment from the papers and circumstances viewed as a whole." (internal quotation marks and citation omitted)); *Neurological Surgery, P.C. v. Travelers Co.*, 243 F. Supp.3d 318, 329 (E.D.N.Y. 2017)(deeming an argument waived because it was not addressed in a party's opposition brief); *Patacca v. CSC Hldgs., LLC*, No. 16-cv-679, 2019 WL 1676001, at *13 (E.D.N.Y. Apr. 17, 2019)(deeming waived claims which are not fully addressed in opposition papers)(collecting cases).   Moreover, since this Court agrees with the Magistrate Judge's finding that there was no authorized first sale from Hallmark to Northstar, Dickens cannot shield itself from trademark dilution liability by raising the first sale doctrine as a defense.   Hence, as a matter of law, Hallmark is entitled to

summary judgment in its favor on its trademark dilution cause of action.

* * *

In sum, Magistrate Judge Shields did not err in finding Dickens cannot shield itself from liability under the Lanham Act by raising the "first sale" doctrine as a defense since "[t]he first sale doctrine protects only those sellers who take possession as part of an innocent chain of title, [but, as the undisputed evidence establishes], [Northstar admittedly did] not acted innocently. The first sale doctrine, therefore, does not shield [Dickens]." *Holsey Corp. v. Waldron Street Book Co.*, No. 05-cv-4210, 2006 WL 2506592, at *3 (E.D.N.Y. Aug. 21, 2006).

To the extent not articulated, the Court has considered Dickens' remaining arguments in support of its objections to the Report and finds them to be without merit. Even under the more stringent *de novo* review standard, no error is found in the Report. Hence, Dickens' objections are overruled and Magistrate Judge Shields' well-reasoned recommendations regarding the HM Motion and the Dickens Motion are adopted in their entirety. (*See* Report at 21.)

V.  Conclusion

Accordingly, IT IS HEREBY ORDERED that Hallmark's Motion is GRANTED, and Dickens' Motion is DENIED; and

IT IS FURTHER ORDERED that, at the October 27, 2020 telephonic Status Conference scheduled to commence at 10:00 a.m., the Parties are to be prepared to address Hallmark's remaining claims and its Prayer for Relief. Chambers' teleconferencing number is (877) 336-1280, and the access code is 7215690.

SO ORDERED this 21st day of October 2020 at Central Islip, New York.

/s/  *Sandra J. Feuerstein*

Sandra J. Feuerstein
United States District Judge